# United States Court of Appeals

*for the*

# Federal Circuit

SHIRE LLC, SHIRE DEVELOPMENT INC., SHIRE DEVELOPMENT, LLC.,

*Plaintiffs-Appellees,*

– v. –

AMNEAL PHARMACEUTICALS, LLC, ROXANE LABORATORIES INC., SANDOZ INC., MYLAN INC., MYLAN PHARMACEUTICALS INC., JOHNSON MATTHEY INC., JOHNSON MATTHEY PHARMACEUTICAL MATERIALS, ACTAVIS ELIZABETH LLC, ACTAVIS LLC,

*Defendants-Appellants.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
IN CASE NOS. 11-3781, 11-4053, 11-3787, 11-3886, AND 12-3234,
JUDGE STANLEY R. CHESLER.

## CORRECTED NON-CONFIDENTIAL BRIEF ON BEHALF OF PLAINTIFFS-APPELLEES

EDGAR H. HAUG
PORTER F. FLEMING
SANDRA KUZMICH
ANGUS CHEN
RICHARD F. KURZ
FROMMER LAWRENCE & HAUG LLP
745 Fifth Avenue
New York, New York 10151
(212) 588-0800

JANUARY 30, 2015

*Attorneys for Plaintiffs-Appellees*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellees Shire LLC and Shire Development LLC (f/k/a Shire Development Inc.) certify the following:

1.    The full name of every party represented by me is:

> Shire LLC and Shire Development LLC (f/k/a Shire Development Inc.)

2.    The names of the real parties in interest represented by me are:

> Shire LLC and Shire Development LLC

3.    All parent corporations and any publicly held companies that own 10 percent or more stock of the party or amicus curiae represented by me are:

> Shire LLC and Shire Development LLC are wholly-owned subsidiaries of Shire plc

4.    The names of all law firms and the partners and associates that have appeared for the party represented by me in the trial court or are expected to appear in this court are:

> FROMMER LAWRENCE & HAUG LLP:  Edgar H. Haug, Porter F. Fleming, Sandra Kuzmich, Angus Chen, Jason A. Lief, David A. Zwally, Joseph Saphia, Nicholas F. Giove, Andrew S. Roper, Richard F. Kurz, Stephanie M. Roberts, Leann M. Clymer, Michael W. Harkness, and Eric A. Lindberg (former).

> GIBBONS P.C.:  Michael R. Griffinger, Robert C. Brady, Charles H. Chevalier, Lisa H. Wang (former), and Ralph A. Dengler (former).

Respectfully submitted,

Dated:  January 30, 2015                  /s/ Edgar H. Haug
                                          Edgar H. Haug
                                          **FROMMER LAWRENCE & HAUG LLP**
                                          *Counsel for Appellees*
                                          *Shire LLC and*
                                          *Shire Development LLC*
                                          *(f/k/a Shire Development Inc.)*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........................................................... i

TABLE OF CONTENTS ..................................................................... iii

TABLE OF AUTHORITIES ............................................................... vii

TABLE OF ABBREVIATIONS ........................................................... xiii

STATEMENT OF RELATED CASES ................................................ xvi

STATEMENT OF THE ISSUES ........................................................ 1

SUMMARY OF THE ARGUMENT ................................................... 2

ARGUMENT ..................................................................................... 6

I.    Legal Standards ...................................................................... 6

II.   Defendants Did Not Identify Evidence to Support Their Burden to
      Overcome the Validity of the Claimed Compounds ...................... 6

      A.    Defendants Did Not Identify Evidence to Make a *Prima Facie*
            Case of Obviousness of the Claimed Mesylate Salt of
            Lisdexamfetamine ............................................................. 8

            1.    Defendants Did Not Identify a Known Lisdexamfetamine
                  Compound as a Lead Compound ...................................... 9

            2.    Defendants Did Not Identify Evidence Showing a Reason
                  to Make a Mesylate Salt of Lisdexamfetamine ................ 10

            3.    Defendants Did Not Identify Evidence That Would
                  Provide a Reasonable Expectation of Success for a
                  Mesylate Salt of Lisdexamfetamine ................................ 12

            4.    *Pfizer*'s Particularized Facts Are Not Present Here ........ 15

      B.    Defendants' Allegation That a POSA Would Modify
            d-amphetamine as a Lead Compound to Make a Mesylate Salt
            of Lisdexamfetamine Relies on Hindsight ............................ 18

1.    Defendants Did Not Provide a Reasoned Identification of a Lead Compound ..................................................20

2.    AU'168 Does Not Render a Mesylate Salt of Lisdexamfetamine Obvious .......................................21

   a.    Page 7 of AU'168 Does Not Make a Mesylate Salt of Lisdexamfetamine Obvious.............................................22

   b.    Defendants' New Argument Concerning Formula IV of AU'168 Should Be Rejected ..........................................24

   c.    Defendants' New Argument Concerning Example 24 of AU'168 Should Be Rejected ..........................................26

3.    Defendants Fail to Identify How Miller Allegedly Overcomes AU'168's Deficiencies ..........................................29

4.    Defendants Do Not Identify How Abramić Overcomes AU'168's Deficiencies...............................................31

5.    Alleged "Similarities" with the Prior Art Do Not Make the Claimed Compound Obvious to Try...................................32

6.    Defendants' Reliance on *BMS* Is Unfounded ..........................35

7.    The District Court Considered the Scope and Content of the Prior Art ....................................................36

C.  Defendants' "Proposition" That the Obviousness Analysis Could Begin With the Assumption That Lisdexamfetamine Is Anticipated Should Be Rejected ........................................38

   1.    Defendants' Legally-Flawed Hybrid-Obviousness Argument Suffers from a Failure of Proof.................................38

   2.    Defendants' Anticipation Analysis in Their Hybrid-Obviousness Argument Is Also Flawed....................................40

      a.    A POSA Would Not "Immediately Envision" All of the Compounds Disclosed on AU'168's Page 7 or by Formula IV....................................................41

iv

| | | | |
|---|---|---|---|
| | b. | *Wrigley* and *Finisar* Do Not Support Finding Chemical Compounds Obvious | 43 |

D. Defendants Did Not Address the Dependent Claims .......................... 45

III. Defendants Identified No Evidence to Support Their Burden to Overcome the Validity of Method Claim 4 of the '486 Patent .................... 45

IV. Defendants' Last-Minute Request to Assert a New Invalidity Contention Was Properly Denied .................................................... 49

V. The District Court Correctly Found JM Liable for Induced Infringement of the Compound Claims ........................................... 52

    A. *Forest* Is Controlling Precedent, and Principles of *Stare Decisis* Compel Affirming the District Court's Judgment ............................. 53

        1. There Is No Basis to Depart from *Forest* Because *Forest* Cannot Be Distinguished .......................................... 55

            a. The Stipulation in *Forest* Does Not Change Its Holding .................................................................. 55

        2. JM's Argument That Induced Infringement Standards Differ between Method and Compound Claims Is Mistaken .................................................................. 56

        3. JM's Jurisdictional Argument Is Belied by the Injunction Granted in *Forest* ..................................................... 57

    B. JM Ignores Its Liability under Section 271(e)(2) for Future Infringement under Section 271(b) .................................................... 57

        1. There Is Nothing "Speculative" about JM's Infringement ....... 60

        2. The Safe Harbor Does Not "Exempt" JM from Induced Infringement Liability .................................................. 62

        3. Injunctive Relief Is Available to Prevent JM's Future Commercial Infringement .......................................... 63

    C. JM's Commercial Activities Are Not Protected by the Safe Harbor ............................................................................ 64

1.      JM's API Is Outside of the Safe Harbor's Scope ....................64

2.      JM's Use of Its DMF Is Commercial........................................65

3.      Commercial Supply Agreements Are Not Protected by
        the Safe Harbor .......................................................................66

4.      The Hatch-Waxman Act Does Not Preclude Liability for
        API Suppliers' Commercial Activities .....................................67

D.      *Forest* Did Not Deter API Manufacturers or ANDA
        Development .........................................................................69

E.      GPhA's "Alternative" Requested Relief Wrongly Seeks
        Judicially-Created Amnesty for API-Suppliers .................................69

CONCLUSION ...................................................................................72

## CONFIDENTIAL MATERIAL OMITTED

Pages 11, 14, 18, 21, 25-30, 42, 46, and 66 include redactions to omit material that has been designated as confidential.  The material omitted on page 18 has been designated by Shire as confidential business information concerning the development of its product.  The material omitted on pages 11, 14, 21, 25-30, 42, 46, and 66 has been designated by Defendants as confidential, and according to Defendants these pages contain confidential business information and confidential analyses by Defendants' expert witnesses.  The redacted information was designated as confidential or highly confidential under the Discovery Confidentiality Order dated March 5, 2012.

# TABLE OF AUTHORITIES

## CASES

*Abtox, Inc. v. Exitron Corp.*,
122 F.3d 1019 (Fed. Cir. 1997) ...................................................64

*ACCO Brands, Inc. v. ABA Locks Mfr. Co.*,
501 F.3d 1307 (Fed. Cir. 2007) ...................................................62

*Allergan, Inc. v. Sandoz Inc.*,
726 F.3d 1286 (Fed. Cir. 2011) ...................................................48

*Arbaugh v. Y & H Corp.*,
546 U.S. 500 (2006)....................................................................57

*Ashe v. Swenson*,
397 U.S. 436 (1970).....................................................................70

*Barclay v. United States*,
443 F.3d 1368 (Fed. Cir. 2006) ...................................................54

*Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*,
796 F.2d 443 (Fed. Cir. 1986) .....................................................47

*Bristol-Meyers Squibb Co. v. Teva Pharm. USA, Inc.*,
752 F.3d 967 (Fed. Cir. 2014) .....................................................35

*Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*,
132 S. Ct. 1670 (2012)......................................................... 57, 67

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)........................................................................6

*Classen Immunotherapies, Inc. v. Biogen Idec*,
659 F.3d 1057 (Fed. Cir. 2011) ...................................................66

*Daiichi Sankyo Co., Ltd. v. Matrix Labs., Ltd.*,
619 F.3d 1346 (Fed. Cir. 2010) ...................................................36

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
567 F.3d 1314 (Fed. Cir. 2009) ................................ 12, 13, 22, 24

*Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd.,*
    533 F.3d 1353 (Fed. Cir. 2008) ......................................... 9, 10, 20

*Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.,*
    471 F.3d 1369 (Fed. Cir. 2006) ............................................43

*Finisar Corp. v. The DirecTV Grp., Inc.,*
    523 F.3d 1323 (Fed. Cir. 2008) ............................................44

*Forest Labs., Inc. v. Ivax Pharm., Inc.,*
    501 F.3d 1263 (Fed. Cir. 2007) ........ 52, 53, 54, 55, 56, 57, 59, 61, 63, 64, 69

*Gen. Elec. Co. v. Joiner,*
    522 U.S. 136 (1997)...........................................................11

*Glaxo Grp. Ltd. v. Apotex, Inc.,*
    376 F.3d 1339 (Fed. Cir. 2004) ............................................58

*Glaxo Inc. v. Novopharm Ltd.,*
    110 F.3d 1562 (Fed. Cir. 1997) ................................. 58, 61, 62, 65

*Golden Bridge Tech., Inc. v. Nokia, Inc.,*
    527 F.3d 1318 (Fed. Cir. 2008) ......................................... 26, 48

*Halliburton Co. v. Erica P. John Fund, Inc.,*
    134 S. Ct. 2398 (2014).......................................................54

*Hoffmann-La Roche Inc. v. Apotex Inc.,*
    496 F. App'x 46 (Fed. Cir. 2012) ..........................................37

*Impax Labs., Inc. v. Aventis Pharm., Inc.,*
    468 F.3d 1366 (Fed. Cir. 2006) ............................................42

*In re Baird,*
    16 F.3d 380 (Fed. Cir. 1994) ...............................................11

*In re Cyclobenzaprine,*
    676 F.3d 1063 (Fed. Cir. 2012) ....................................... 19, 33

*In re Jones,*
    958 F.2d 347 (Fed. Cir. 1992) ..............................................11

*In re Omeprazole*,
    536 F.3d 1361 (Fed. Cir. 2008) ..................................................34

*In re Petering*,
    301 F.2d 676 (C.C.P.A. 1962) ....................................... 40, 41, 43

*In re Ruschig*,
    343 F.2d 965 (C.C.P.A. 1965) .................................................43

*In re Schaumann*,
    572 F.2d 312 (C.C.P.A. 1978) .......................................... 40, 43

*Johnson Matthey Inc. v. Pfizer, Inc.*,
    No. 2:15-cv-14 (E.D. Va. Jan. 13, 2015), ECF No. 1 ..................60

*Jones v. Hardy*,
    727 F.2d 1524 (Fed. Cir. 1984) ........................................ 39, 47

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007).............................................. 25, 32, 34, 47

*Leo Pharm. Prods., Ltd. v. Rea*,
    726 F.3d 1346 (Fed. Cir. 2013) ........................................ 18, 32, 34

*Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*,
    744 F.3d 1272 (Fed. Cir. 2014) .................................................54

*Limelight Networks, Inc. v. Akamai Techs., Inc.*,
    134 S. Ct. 2111 (2014)........................................................ 61, 62

*Loctite Corp. v. Ultraseal, Ltd.*,
    781 F.2d 861 (Fed. Cir. 1985) ...................................................49

*McElmurry v. Ark. Power & Light Co.*,
    995 F.2d 1576 (Fed. Cir. 1993) .................................................46

*Metro. Edison Co. v. Pa. PUC*,
    767 F.3d 335 (3d Cir. 2014) .......................................................70

*Microsoft Corp. v. i4i Ltd. P'ship*,
    131 S. Ct. 2238 (2011)........................................................... 6, 18

*Momenta Pharm., Inc. v. Amphastar Pharm., Inc.*,
    686 F.3d 1348 (Fed. Cir. 2012) ............................................................ 65, 66

*O2 Micro Int'l, Ltd. v. Monolithic Power Sys.*,
    467 F.3d 1355 (Fed. Cir. 2006) ...................................................... 49, 50, 51

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
    520 F.3d 1358 (Fed. Cir. 2008) ....................................................... 12, 26, 32

*Otsuka Pharm. Co. v. Sandoz, Inc.*,
    678 F.3d 1280 (Fed. Cir. 2012) ............... 9, 15, 16, 20, 29, 30, 31, 32, 36, 39

*Pfizer, Inc. v. Apotex, Inc.*,
    480 F.3d 1348 (Fed. Cir. 2007) ................................. 9, 15, 16, 17, 20, 30, 39

*Proveris Sci. Corp. v. Innovasystems, Inc.*,
    536 F.3d 1256 (Fed. Cir. 2008) ............................................................ 64, 65

*Rivas v. City of Passaic*,
    365 F.3d 181 (3d Cir. 2004) ..........................................................................66

*Sage Prods., Inc. v. Devon Indus., Inc.*,
    126 F.3d 1420 (Fed. Cir. 1997) ...................................................................25

*Sanofi-Synthelabo v. Apotex, Inc.*,
    550 F.3d 1075 (Fed. Cir. 2008) ...................................................................15

*Unigene Labs., Inc. v. Apotex, Inc.*,
    655 F.3d 1352 (Fed. Cir. 2011) ....................................................... 20, 33, 47

*United Therapeutics Corp. v. Sandoz Inc.*,
    No. 3:13-cv-316 (D.N.J. Mar. 31, 2014), ECF No. 88.................................57

*Valeant Int'l (Barbados) SRL v. Watson Pharm., Inc.*,
    No. 10-20526, 2011 U.S. Dist. LEXIS 128742
    (S.D. Fla. Nov. 7, 2011) ..............................................................................14

*Valeant Int'l Bermuda v. Actavis Inc.*,
    534 F. App'x 999 (Fed. Cir. 2013)..............................................................14

*Warner-Lambert Co. v. Apotex Corp.*,
    316 F.3d 1348 (Fed. Cir. 2003) ........................................... 58, 60, 61, 67, 68

*Whitserve, LLC v. Computer Packages, Inc.*,
    694 F.3d 10 (Fed. Cir. 2012) ............................................................... 46, 48

*Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*,
    683 F.3d 1356 (Fed. Cir. 2012) ....................................................... 41, 43, 44

<u>STATUTES</u>

28 U.S.C. § 1338(a) ........................................................................... 57, 58

35 U.S.C. § 102 ......................................................................................39

35 U.S.C. § 103 ......................................................................................39

35 U.S.C. § 156 ......................................................................................64

35 U.S.C. § 271 ......................................................................................57

35 U.S.C. § 271(b) ....................................................... 52, 53, 56, 57, 58, 59, 66

35 U.S.C. § 271(e) ......................................................... 52, 54, 57, 63, 67

35 U.S.C. § 271(e)(1)................................................... 52, 53, 59, 63, 64, 65, 66, 68

35 U.S.C. § 271(e)(2).................... 52, 53, 54, 55, 56, 57, 58, 59, 61, 62, 63, 64, 68

35 U.S.C. § 271(e)(4)................................................................... 63, 67, 68

35 U.S.C. § 282(a) ................................................................. 6, 7, 45, 47

<u>RULES</u>

D.N.J. L. Pat. R. 3.7 ........................................................................ 50, 51

Fed. R. Civ. P. 54(b) ............................................................................ xvi

<u>REGULATIONS</u>

21 C.F.R. § 314.420(a)............................................................... xiv, 64, 65

21 C.F.R. § 314.420(b) ............................................................................65

## <u>TABLE OF ABBREVIATIONS</u>

| | |
|---|---|
| "'630 patent" | U.S. Patent No. 7,655,630 (A227-A332) |
| "'787 patent" | U.S. Patent No. 7,662,787 (A583-A673) |
| "'253 patent" | U.S. Patent No. 7,659,253 (A333-A476) |
| "'486 patent" | U.S. Patent No. 7,105,486 (A47-A136) |
| "A____" | Joint Appendix page number(s), including the Addendum to the Opening Brief of Defendants-Appellants Johnson Matthey Inc. and Johnson Matthey Pharmaceutical Materials, ECF No. 64 |
| "Add.___" | Addendum to Brief of Appellants page number(s), ECF No. 62 |
| "ADHD" | Attention Deficit Hyperactivity Disorder |
| "ANDA" | Abbreviated New Drug Application |
| "ANDA-Defendants" | Collectively the Actavis Elizabeth LLC, Actavis LLC, Amneal Pharmaceuticals, LLC, Mylan Inc., Mylan Pharmaceuticals Inc., Roxane Laboratories Inc., and Sandoz Inc. parties |
| "ANDA-filers" | Collectively the ANDA-Defendants (*supra*) |
| "API" | Active Pharmaceutical Ingredient |
| "APPBr.___" | Page number(s) of the Brief of Appellants, ECF No. 62 |
| "asserted claims" | Claims 1-4 of the '630 patent, claim 3 of the '787 patent, claims 1-12 of the '253 patent, and claim 4 of the '486 patent |

xiii

| | |
|---|---|
| "AU'168" | Australian Patent Application No. AU 54,168/65 to F. Hoffmann-La Roche & Co., which states that it was published on July 21, 1964 (A92044-81) |
| "compound claims" | Claims 1-4 of the '630 patent, claim 3 of the '787 patent, and claims 1-12 of the '253 patent |
| "compound patents" | The '630, '787, and '253 patents |
| "d-amphetamine" | Dextroamphetamine |
| "Defendants" | Collectively the ANDA-Defendants (*supra*) and JM (*infra*) parties |
| "DMF" | Drug Master File, 21 C.F.R. § 314.420(a) |
| "FDA" | United States Food and Drug Administration |
| "FDCA" | Federal Food, Drug, and Cosmetic Act, Pub. L. No. 75-717, ch. 675, 52 Stat. 1040 (1936) (codified at scattered sections of title 21 of the United States Code) |
| "GPhA" | Generic Pharmaceutical Association, which submitted an *amicus curiae* brief in support of JM (*infra*) |
| "GPhABr.___" | Page number(s) of the Brief for the Generic Pharmaceutical Association as *Amicus Curiae* Supporting Appellants Johnson Matthey Inc. and Johnson Matthey Pharmaceutical Materials and Supporting Reversal, ECF No. 77 |
| "Hellerbach" | AU'168 (*supra*) |
| "Hoffmann" | AU'168 (*supra*) |
| "JM" | Collectively the Johnson Matthey Inc. and Johnson Matthey Pharmaceutical Materials parties |

| | |
|---|---|
| "JMBr.___" | Page number(s) of the Opening Brief of Defendants-Appellants Johnson Matthey Inc. and Johnson Matthey Pharmaceutical Materials, ECF No. 64 |
| "LDX" | Lisdexamfetamine |
| "L-lysine-d-amphetamine" | Lisdexamfetamine |
| "Local Patent Rules" | Local Patent Rules for the U.S. District Court for the District of New Jersey, which are found at the District of New Jersey's Local Civil Rule 9.3 |
| "patents-in-suit" | The '630, '787, '253, and '486 patents |
| "POSA" | Person of Ordinary Skill in the Art |
| "PTO" | United States Patent and Trademark Office |
| "Vyvanse®" | The brand name for Shire's lisdexamfetamine dimesylate drug |

## <u>STATEMENT OF RELATED CASES</u>

No appeal in or from the same civil action was previously before this Court or any other appellate court.  Other than the district court cases from which this appeal is taken under Federal Rule of Civil Procedure 54(b), Shire is not aware of any case in this or any other court that will directly affect or be directly affected by this appeal.

## <u>STATEMENT OF THE ISSUES</u>

Whether the district court correctly granted Shire's summary judgment motion that the asserted claims are nonobvious, in view of Defendants' failure to identify necessary evidence to establish a *prima facie* case?

Whether the district court correctly enforced its Local Patent Rules by denying Defendants' motion to amend their invalidity contentions for one patent, after finding that the request was untimely and that Shire would be unduly prejudiced by Defendants' request to amend nine days before fact discovery closed, which Defendants conceded was months after they had all of the information that they needed?

Whether the district court correctly granted summary judgment that the supplier of the ANDA-filers' infringing compound is liable for induced infringement of the asserted compound claims based on this Court's precedent?

## SUMMARY OF THE ARGUMENT

In this Hatch-Waxman action, the district court granted Shire's summary judgment motion that the compound claims (claims 1-4 of the '630 patent, claim 3 of the '787 patent, and claims 1-12 of the '253 patent) and a method of treatment claim (claim 4 of the '486 patent) are not invalid and are infringed by the ANDA-Defendants and their API supplier. The claims cover Shire's lisdexamfetamine dimesylate drug, marketed as Vyvanse®, which is indicated for the treatment of ADHD.

### Summary Judgment of Non-Obviousness Was Properly Granted

Shire moved for summary judgment that the asserted claims are not invalid based on Defendants' failure of proof. Defendants have the burden to prove the invalidity of each patent claim by clear and convincing evidence.

The district court correctly found that Defendants did not identify evidence to make a *prima facie* case of obviousness of the asserted claims.[1] Thus, the district court concluded that "[t]he evidence on invalidity here is so one-sided that Plaintiffs must prevail as a matter of law." (A36.) The district court reached this judgment after fully considering the parties' summary judgment briefing, hearing oral argument on the issue, and considering the parties' supplemental briefing. (A22.)

---

[1] Defendants did not appeal the district court's judgment that the claims are not anticipated.

2

Regarding the validity of the claimed compound, a mesylate salt of lisdexamfetamine,[2] the district court's summary judgment ruling should be upheld because Defendants failed to identify (i) a known lisdexamfetamine compound as a lead compound, (ii) prior art that would have given a POSA a motivation to make the claimed mesylate salt of lisdexamfetamine, or (iii) prior art that would establish that a POSA would have a reasonable expectation of success that such a compound would work for its intended purpose in a pharmaceutical composition.

Defendants improperly rely on hindsight in arguing that a POSA would have selected d-amphetamine as a lead compound, and would have transformed it into a mesylate salt of lisdexamfetamine.  Defendants failed to show any reason for a POSA to (i) start with d-amphetamine, (ii) chemically modify d-amphetamine, (iii) make a prodrug of d-amphetamine, (iv) synthesize lisdexamfetamine while ignoring other conjugates of d-amphetamine, (v) make a salt of lisdexamfetamine instead of using the freebase form, and finally (vi) specifically choose a mesylate salt rather than any other salt.  Defendants' "obvious to try" arguments also fail because Defendants identified no evidence that the claimed mesylate salt of lisdexamfetamine was an identified, predictable solution to any known problem.

Regarding the validity of the method of treatment claim, Defendants failed to identify any evidence that would establish a *prima facie* case of obviousness for

---

[2] The drug-at-issue, lisdexamfetamine dimesylate, is a mesylate salt of lisdexamfetamine.  (A57341 n.7.)

the claimed method of treating ADHD with a mesylate salt of lisdexamfetamine.

Defendants' expert did not opine on this claim.  Instead, Defendants rely on their

expert's deposition statement that his general opinions "may" include the claimed

mesylate salt.  But as the district court correctly found, this "statement does not

even rise to the level of a conclusory statement of obviousness," and could not

defeat summary judgment.  (A35.)

### The District Court Properly Denied Defendants' Untimely Motion to Amend Their Invalidity Contentions for the '253 Patent

There was no error in the district court's denial of Defendants' motion to

amend their invalidity contentions for the '253 patent because Defendants moved

to amend **_nine days_** before fact discovery closed, based on information that they

conceded they had possessed for months.  Thus, both the magistrate judge and the

district court judge (on Defendants' appeal of the magistrate judge's decision)

correctly decided that Defendants did not satisfy the Local Patent Rules'

requirements to:  (i) make a timely application to the court, (ii) show good cause

for or diligence in making the request, and (iii) demonstrate that Shire would not

be unduly prejudiced.

4

## <u>Summary Judgment Against the API Supplier Was Properly Granted</u>

The district court held Defendant API-supplier JM liable for inducing infringement of the compound claims.[3]  This holding is consistent with *Forest*, which had nearly the same facts as here.  Despite this, JM and amicus the Generic Pharmaceutical Association ("GPhA") argue that API suppliers should be immune from infringement.  Since *Forest* already rejected this argument, *stare decisis* principles compel affirming the district court's judgment.

\*        \*        \*

The district court's rulings should be affirmed, and Defendants' appeal should be denied in its entirety.

---

[3] The district court granted summary judgment that the ANDA-Defendants infringe the asserted claims (which was not appealed).

## ARGUMENT

### I.    Legal Standards

Defendants have the burden to prove the invalidity of each patent claim by clear and convincing evidence, and that burden always remains with Defendants. 35 U.S.C. § 282(a); *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2243 (2011).  Shire moved for summary judgment based on Defendants' failure of proof. Thus, summary judgment was properly granted based on Shire "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [Defendants'] case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

### II.   Defendants Did Not Identify Evidence to Support Their Burden to Overcome the Validity of the Claimed Compounds

The district court correctly granted summary judgment after Defendants failed to identify evidence to make a *prima facie* case of obviousness for the claimed mesylate salts of lisdexamfetamine.  (A35; A41.)

On appeal, Defendants' arguments mostly focus on lisdexamfetamine (freebase, i.e., not a salt) instead of the claimed compound, a ***mesylate salt*** of lisdexamfetamine.  (*E.g.*, APPBr.31, 44-50.)  "Because Defendants have not shown that lisdexamfetamine was disclosed in the prior art, the obviousness analysis must begin at the beginning, before the active was known," and thus Defendants used d-amphetamine for the lead compound analysis.  (A31.)  Defendants' failure of proof concerning the claimed mesylate salt form of lisdexamfetamine should by

itself be grounds to affirm.  Accordingly, Shire's brief begins with Defendants'

failure of proof for the claimed salt form (Section II.A *infra*), and then addresses

Defendants' remaining obviousness arguments (Sections II.B-C *infra*).

As a preliminary matter, Shire is compelled to address several

mischaracterizations by Defendants.  Defendants allege that Shire withdrew certain

claims of the '787 patent to lisdexamfetamine (freebase) "[i]n the face of"

Defendants' anticipation summary judgment motion.  (APPBr.31; A4-5.)  In

actuality, these claims were withdrawn in a ***joint*** stipulation that "reduce[d] the

number of claims and defenses in order to streamline issues for trial," following

negotiations that began before summary judgment motions were filed.  (A57337

n.1 (citing A63834-36); A84855-56.)

Additionally, Defendants baselessly assert that "Shire never argued that

[lisdexamfetamine] was novel and nonobvious."  (APPBr.31.)  Defendants'

assertion misses the point because Shire's claims are presumed valid—Defendants

bear the burden to prove otherwise.  35 U.S.C. § 282(a).  Furthermore, Defendants'

assertion concerns lisdexamfetamine freebase instead of the claimed compound, a

mesylate salt of lisdexamfetamine.

Defendants also wrongly allege that the PTO "did not view" the mesylate

salt as imparting novelty and nonobviousness.  (APPBr.44.)  This allegation is

belied by the "Reasons for Allowance" (which Defendants themselves cited)

because the PTO examiner expressly stated that the claimed "salt compound forms [of lisdexamfetamine] . . . [were] not found to be reasonably taught or suggested by the prior art." (APPBr.44 (citing, *inter alia*, A91526, A91540).)

Finally, contrary to Defendants' allegations (APPBr.31), the district court requested supplemental briefing because ***Defendants*** did not argue "a motivation to select a lead compound and why the selection of the lead compound and the salt led to a reasonable expectation of success in making the pharmaceutical compound." (A107964-65, 84:13-85:14.) Tellingly, Defendants' counsel "apologize[d] for not including that." (A107965, 85:2-3.) Even after supplemental briefing, the district court concluded that "[t]he evidence on invalidity here is so one-sided that Plaintiffs must prevail as a matter of law." (A36.)

## A. Defendants Did Not Identify Evidence to Make a *Prima Facie* Case of Obviousness of the Claimed Mesylate Salt of Lisdexamfetamine

Defendants' obviousness arguments rely on pure hindsight. Defendants argue that a POSA would start with lisdexamfetamine (freebase) "in hand" and "routine[ly] make pharmaceutically acceptable salts of the compound for its intended purpose." (APPBr.44.) While this assumption is wrong for reasons explained in Sections II.B and C, *infra*, it is also based on a flawed premise because "Defendants have not offered the prior art reference that discloses lisdexamfetamine." (A29.)

8

Defendants also identify no prior art that provides a reason to modify any known compound to make a mesylate salt of lisdexamfetamine, let alone with a reasonable expectation of success.  Thus, Defendants cannot meet their burden to make a *prima facie* case of obviousness of the claimed mesylate salt of lisdexamfetamine because Defendants did not identify evidence that "the prior art would have supplied [a POSA] with a reason or motivation to modify a lead compound to make the claimed compound with a reasonable expectation of success."  *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1291, 1292 (Fed. Cir. 2012) (citing *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007)).

### 1.    Defendants Did Not Identify a Known Lisdexamfetamine Compound as a Lead Compound

Defendants allege that lisdexamfetamine is "a basic drug compound" from which to make a mesylate salt, but Defendants did not identify prior art that discloses lisdexamfetamine.  (APPBr.44.)  This is a fatal omission.  "[A] *prima facie* case of obviousness for a chemical compound still, in general, begins with the reasoned identification of a lead compound."  *Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353, 1359 (Fed. Cir. 2008).  This "analysis is guided by evidence of the compound's pertinent properties," such as "the 'strength, solubility, and other known chemical characteristics' of a prior art salt-forming acid."  *Otsuka*, 678 F.3d at 1292 (quoting *Pfizer*, 480 F.3d at 1363).

9

Since Defendants identified *no* prior art that discloses lisdexamfetamine as a lead compound or its properties, Defendants cannot show and have not shown the requisite: (i) "starting reference point . . . from which a skilled artisan might identify a problem and pursue potential solutions," (ii) "reasons, available within the knowledge of one of skill in the art, to make particular modifications to achieve the claimed compound," and (iii) "reasons for narrowing the prior art universe to a finite number of identified, predictable solutions." *Eisai*, 533 F.3d at 1359 (quotation omitted).

### 2.    Defendants Did Not Identify Evidence Showing a Reason to Make a Mesylate Salt of Lisdexamfetamine

Defendants argue that AU'168 discloses "L-amino acid-d-amphetamine conjugates" and acids that may be used in chemical reactions to form acid addition salts from freebase compounds. (APPBr.45.) But Defendants did not identify prior art that would give a POSA a reason to make lisdexamfetamine (freebase), nor any reason to make a salt thereof and, in particular, a mesylate salt. Even if AU'168 disclosed lisdexamfetamine (which it does not, *infra* Sections II.B and C), AU'168 does not narrow the number of salts to a finite number of identified, predictable solutions to any known problem.

AU'168 also does not disclose methanesulfonic acid, an acid that can be used to form a mesylate acid addition salt. Defendants nonetheless argue that a "mesylate salt [] would have been an obvious variant" of AU'168's p-toluene

*CONFIDENTIAL MATERIAL REDACTED*

sulphonic acid salt. (APPBr.45; A92059.) Defendants assert that a POSA would substitute methanesulfonic acid in place of AU'168's laundry list of acids merely because the list recites "and the like." (*Id.*) The phrase "and the like" does ***not*** render a mesylate salt obvious as a matter of law because it "encompass[es] a 'potentially infinite genus' of salts." *In re Baird*, 16 F.3d 380, 382 (Fed. Cir. 1994) (quoting *In re Jones*, 958 F.2d 347, 350 (Fed. Cir. 1992)); *In re Jones*, 958 F.2d at 349. (*See also* A57357.)

Defendants rely on their expert Dr. Atwood's conclusory opinion that p-toluene sulphonic acid would suggest "a limited group that includes methanesulfonic acid." (APPBr.45.) ████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████ Dr. Atwood's *ipse dixit* opinion should be rejected. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Furthermore, Defendants provide no reason why a POSA would try making salts of lisdexamfetamine from acids that are alleged variants of p-toluene sulphonic acid. Defendants ignore thousands of compounds encompassed by AU'168, such as (i) each of the amino acid-amphetamine conjugates, (ii) each acid

11

addition salt that could be made using the named acids; and (iii) "like" acid

addition salts for each of the named acids, including other "like" sulfonate salts.

Thus, Defendants improperly "discounted the number and complexity of the

alternatives" and erroneously rely on hindsight. *Ortho-McNeil Pharm., Inc. v.*

*Mylan Labs., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008).

> ### 3. Defendants Did Not Identify Evidence That Would Provide a Reasonable Expectation of Success for a Mesylate Salt of Lisdexamfetamine

Defendants have no basis to allege that "each of the salts of

[lisdexamfetamine], including [lisdexamfetamine] dimesylate, is a predictable

solution." (APPBr.46.) "[P]redictability is a touchstone of obviousness." *DePuy*

*Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1326 (Fed. Cir.

2009). But AU'168 gives no guidance about whether a mesylate salt of

lisdexamfetamine would be pharmaceutically acceptable. (A92059.) Indeed,

Defendants' expert Dr. Atwood admitted that a salt form's properties, including its

pharmaceutical acceptability, is "***impossible to predict***." (A63638, 205:15-22

(emphasis added); A63629, 166:2-11.)

AU'168's failure to teach or suggest the claimed mesylate salt of

lisdexamfetamine is not overcome by the alleged popularity of certain salts

according to Berge and Bighley, or by the different compound in Miller.

(APPBr.45-47; *see also* Section II.B.3 *infra*.) None of these references disclose

lisdexamfetamine or any properties thereof.  Moreover, Berge explains that

"[c]hoosing the appropriate salt [] can be a very difficult task, since each salt

imparts unique properties to the parent compound" and "there is ***no reliable way of

predicting*** the influence of a particular salt species on the behavior of the parent

compound."  (A91623 (emphasis added).)  Dr. Atwood further explained that

"Berge describes that different salts have different toxicities, solubilities,

stabilities, dissolution rates, hygroscopicities, and can affect formulation

characteristics of the drug.  Different salts can prolong the action of a

pharmaceutical agent, [and] can have different pharmacokinetic properties . . . ."

(A63638-39, 205:15-208:10 (quotation omitted).)  Indeed, Berge states that

"[c]learly, the salt form can have a dramatic influence on the overall properties of

the parent compound."  (A91638.)  Thus, Berge, Bighley, and Miller do ***not***

support the proposition that a mesylate salt of lisdexamfetamine's properties could

be predicted.

"[T]he 'predictable result' discussed in *KSR* refers not only to the

expectation that prior art elements are capable of being physically combined, but

also that the combination would have worked for its intended purpose."  *DePuy*,

567 F.3d at 1326.  Although the parties agree that the intended purpose of a

mesylate salt of lisdexamfetamine is for "incorporation into a pharmaceutical

composition," (A103738), Defendants' expert Dr. Atwood did ***not*** opine that a

CONFIDENTIAL MATERIAL REDACTED

POSA could predict that a mesylate salt of lisdexamfetamine would work for that purpose.[4]  This is because Dr. Atwood's opinion[5] is that salts and their pharmaceutical acceptability are unpredictable:

> Along with the unpredictability of salt formation, the physical and chemical properties of any form is **impossible to predict**.  These properties include . . . pharmaceutical acceptability . . . .  Thus, experimentation is required to determine whether a salt can even be made and what its properties would be.
>
> \*     \*     \*
>
> Those skilled in the art would have had to experiment with different salts to study the properties of their forms empirically, because such properties were **not predictable** in 1995 and even today.

(A63638-39, 205:15-208:10 (emphasis added).)  In fact, "[a]s a general rule, salt selection is an unpredictable art," and the alleged popularity of mesylate salts "is simply not probative as to whether" a mesylate salt of the particular compound in question would have been reasonably expected to have desired properties.  *Valeant Int'l (Barbados) SRL v. Watson Pharm., Inc.*, No. 10-20526, 2011 U.S. Dist. LEXIS 128742, at \*19, \*28-29 (S.D. Fla. Nov. 7, 2011) (citing Berge and Bighley), *aff'd sub nom. Valeant Int'l Bermuda v. Actavis Inc.*, 534 F. App'x 999 (Fed. Cir. 2013) (per curiam); *see also Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d

---

[4] ████████████████████████████████████████████████████
████████████████

[5]   Dr. Atwood's testimony was from his declaration in a different case, but he testified in the present case that it is "certainly" important to him that his opinions on issues are consistent, including for salt selection, and he "always tell[s] the truth."  (A63590, 12:19-13:18; A63638-39, 204:14-208:20.)

1075, 1089 (Fed. Cir. 2008) (noting that the experts of both parties agreed that whether a pharmaceutically suitable salt will form is unpredictable).

Defendants identified no evidence that a mesylate salt of lisdexamfetamine would depart from the general rule that salts are unpredictable. Defendants' conclusory allegation that "each" salt of lisdexamfetamine (including dimesylate) "is a predictable solution" is unfounded. (APPBr.46.) Defendants have not shown that a POSA would have had a reasonable expectation of success. *Otsuka*, 678 F.3d at 1292.

### 4. *Pfizer*'s Particularized Facts Are Not Present Here

Defendants' allegation that *Pfizer* somehow generally held it "routine to make pharmaceutically acceptable salts of [a] compound for its intended purpose" is meritless. (APPBr.44.) *Pfizer* was based on "*particularized facts*," and narrowly held that the particular salt in question was obvious because the salt form had "no effect on the therapeutic effectiveness of the active ingredient" in question and "the prior art heavily suggest[ed] the particular anion used to form the salt." 480 F.3d at 1367, 1368 (emphasis in original). Such particularized facts are ***not*** present here.

*Pfizer* concerned switching from a known lead compound, amlodipine maleate, to a different salt thereof, amlodipine besylate. 480 F.3d at 1353. Furthermore, *Pfizer* "premised its conclusion on findings that the prior art not only

provided 'ample motivation to narrow the [prior art] genus of . . . salt-forming

anions . . . to a few [species],' [] but also 'predicted the results.'" *Otsuka*, 678 F.3d

at 1295 (quoting *Pfizer*, 480 F.3d at 1363, 1367).

There was a motivation to change the salt because a "[POSA], facing the

problems including the stickiness of the tablet form of the maleate [] salt, would

have been motivated . . . to produce the besylate salt of amlodipine," and the prior

art "clearly directed" a POSA to that salt. *Pfizer*, 480 F.3d at 1364, 1366. There

was also a reasonable expectation of success because "Pfizer downplayed any

difference between amlodipine maleate and any other [] salt form of amlodipine,

including the [claimed] besylate," and "conceded in prior litigation that the type of

salt had no effect on the therapeutic effect of the active ingredient, amlodipine, and

was practically interchangeable." *Id.* at 1365, 1366. It was also "known [in the

prior art] that the besylate salt of amlodipine would work for its intended purpose."

*Id.* at 1365. Thus, on "the *particularized facts*" of *Pfizer*, "the prior art provided

not only the means of creating acid addition salts but also predicted the results,

which Pfizer merely had to verify through routine testing." *Id.* at 1367 (emphasis

in original).

This case is completely unlike *Pfizer* because *Pfizer*'s lead compound was

known in the prior art, its problems were known, researchers were motivated to try

other salts of it, and the prior art provided a reasonable expectation of success since

Pfizer conceded that the salt of that particular compound did not change its

therapeutic effects.  480 F.3d at 1353-54.  In contrast, here "Defendants have

pointed to no evidence that the prior art knew of lisdexamfetamine as an active

drug substance, nor evidence that the prior art had any knowledge of any of the

characteristics of lisdexamfetamine."  (A30.)  As such, there cannot have been any

motivation to try variants thereof (including salts), nor any reasonable expectation

of success.

    *Pfizer* also does not support Defendants' argument that the alleged use of a

"salt screen" to make and test different acids to find out their properties would

support an obviousness finding.  (APPBr.48-49.)  To be obvious, a POSA must be

able to "predict[] the results, which [one would] merely [have] to verify through

routine testing."  *Pfizer*, 480 F.3d at 1367.  A "salt screen" does not overcome

Defendants' failure to identify evidence that lisdexamfetamine's properties were

known or predictable.  As Defendants' expert Dr. Atwood recognizes, "[a]long

with the unpredictability of salt formation, the physical and chemical properties of

any form is ***impossible to predict***."  (A63638, 205:15-22 (emphasis added);

A63629, 166:2-11.)

    Moreover, Defendants' "salt screen" argument assumes that "a POSA

[would be] interested in making a salt form of a known drug" and would set out to

make and test salts of it.  (APPBr.17.)  But Defendants did not identify a known

CONFIDENTIAL MATERIAL REDACTED

lisdexamfetamine compound, or that there was a known problem to be solved by making and testing salts of it.[6]  (A29.)  "Only after recognizing the existence of [a] problem would [a POSA] *then* turn to the prior art and attempt to develop" a solution.  *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1354 (Fed. Cir. 2013) (emphasis in original).  Additionally, Defendants' allegation that the inventors were able to quickly develop the claimed compound using a "salt screen" is irrelevant.  (APPBr.19.)  Even if *arguendo* a "salt screen" had been used, "[t]he inventor's own path itself never leads to a conclusion of obviousness; that is hindsight.  What matters is the path that a [POSA] would have followed, as evidenced by the pertinent prior art."  *Otsuka*, 678 F.3d at 1296 (deciding that the inventors' "short timeline" was irrelevant).

The burden of proving invalidity falls on Defendants.  *Microsoft*, 131 S. Ct. at 2243.  Yet Defendants have failed to identify evidence that would make a *prima facie* case of obviousness for a mesylate salt of lisdexamfetamine.

## B.  Defendants' Allegation That a POSA Would Modify d-amphetamine as a Lead Compound to Make a Mesylate Salt of Lisdexamfetamine Relies on Hindsight

Defendants did not show that a POSA would identify d-amphetamine as a lead compound and have a reason to modify it to make a mesylate salt of

---

[6]

lisdexamfetamine, or that the claimed compound would be obvious to try.

In particular, Defendants identify no prior art that would show a reason for a POSA

to (i) start with d-amphetamine, (ii) chemically modify d-amphetamine, (iii) make

a prodrug of d-amphetamine, (iv) synthesize lisdexamfetamine while ignoring

other conjugates of d-amphetamine, (v) make a salt of lisdexamfetamine instead of

using the freebase form, and finally (vi) specifically choose a mesylate salt rather

than any other salt. (A107857.) Lacking such evidence, Defendants "urge[] an

obviousness finding by merely throwing metaphorical darts at a board in hopes of

arriving at a successful result, but [where] the prior art gave [] no indication of

which [] of many possible choices is likely to be successful, courts should reject

hindsight claims of obviousness." *In re Cyclobenzaprine*, 676 F.3d 1063, 1070-71

(Fed. Cir. 2012) (quotations omitted).

Defendants failed to identify any prior art that shows *why* a POSA would

have a reason to modify d-amphetamine to make a mesylate salt of

lisdexamfetamine and *why* there would be a reasonable expectation of success that

it would work for its intended purpose in a pharmaceutical composition.

(A107853-60.) "[T]o establish a *prima facie* case of obviousness . . . *the law

requires a motivation* to select the references and to combine them in the particular

claimed manner to reach the claimed invention." *Unigene*, 655 F.3d at 1361

(emphasis added). Defendants failed to identify such evidence.

19

Defendants improperly attempt to piece together prior art references under the assumption that a POSA would set out to specifically make a mesylate salt of lisdexamfetamine. (APPBr.32.) But "[o]bviousness requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim." *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). Defendants' hindsight arguments should be rejected.

### 1. Defendants Did Not Provide a Reasoned Identification of a Lead Compound

Defendants selected d-amphetamine as their lead compound, but they did not identify any prior art that would provide a reason for a POSA to decide to select and modify it. (APPBr.32.) Thus, Defendants did not make a *prima facie* case of obviousness because they did not "begin[] with the ***reasoned*** identification of a lead compound." *Eisai*, 533 F.3d at 1359 (emphasis added). Specifically, Defendants failed to identify the requisite prior art that would provide: (1) "a starting reference point . . . from which a [POSA] might identify a problem and pursue potential solutions," (2) "reasons, available within the knowledge of one of skill in the art, to make particular modifications to achieve the claimed compound," and (3) "reasons for narrowing the prior art universe to a finite number of identified, predictable solutions." *Eisai*, 533 F.3d at 1359 (quotations omitted); *see also Otsuka*, 678 F.3d at 1291-92 (citing *Pfizer*, 480 F.3d at 1361). Accordingly, "Defendants have not clearly articulated the design need or market

pressure to solve a problem" with d-amphetamine.  (A33.)  To the contrary,

Defendants admit that "FDA has long approved d-amphetamine as safe and

therapeutically effective."  (APPBr.32.)

### 2. AU'168 Does Not Render a Mesylate Salt of Lisdexamfetamine Obvious

Defendants' reliance on AU'168 to show obviousness of a mesylate salt of

lisdexamfetamine is unfounded.  AU'168 does not teach making any

lisdexamfetamine compound because it only generally discloses that "[o]ptically

active α-amino carboxylic acids [may be] use[d] in the acylation of amphetamine,"

using a broad formula.  (A92045; A92050.)



*see also* n.7 *infra*.)

Defendants rely on hindsight to allege that a POSA would jump to page 7 of

AU'168 and allegedly be "motivated to select d-amphetamine as the lead

compound and to conjugate it with any of these 18 L-amino acids with a

reasonable expectation of success."  (APPBr.33.)  Defendants never explain ***why*** a

POSA would be motivated to make such conjugates, and "do not point to anything

which supports the inference that these are solutions to a particular problem, and certainly not that they are predictable." (A33.)

Defendants wrongly argue that AU'168 teaches making modifications to a "compound [] not [] to alter [the] therapeutic effect, but instead to create a prodrug of d-amphetamine to yield the same therapeutic effect." (APPBr.32-33.) As an initial matter, AU'168 does not mention prodrugs. Furthermore, AU'168 teaches compounds that "are *substantially free* from central nervous system stimulatory effect[s]." (A92059 (emphasis added); A85952 ¶ 58 (quoting A100820, A100839; *see also* A100796, A100798, A100827, A100829)).) By contrast, the intended purpose of the claimed compound is exactly the opposite—it is a *central nervous system stimulant*. (A32; A299, col.1 ll.29-44; A57449; A92059.) In this respect, AU'168 teaches away from the claimed compound. "An inference of nonobviousness is especially strong where the prior art's teachings undermine the very reason being proffered as to why a [POSA] would have combined the known elements." *DePuy*, 567 F.3d at 1326.

### a. Page 7 of AU'168 Does Not Make a Mesylate Salt of Lisdexamfetamine Obvious

Notwithstanding Defendants' characterizations, page 7 of AU'168 does *not* merely disclose "a list of 18 amino acids including lysine" for conjugation to d-amphetamine, and does *not* suggest L-lysine. (*See* APPBr.33.) Page 7 of AU'168 encompasses an open-ended, infinite group of amino acids, based on its

22

express use of the following broad language to describe potential amino acids and their derivatives:

- "can belong to the D- or L-series";

- "such as optically active";

- "are represented, preferably, by those derived from proteins"; and

- "the like."

(A92050; A94078; A96381, 98:13-100:3.)

Defendants ignore that page 7's named amino acids are only "representat[ive]," and the group includes amino acid derivatives "such as" the named amino acids "and the like."[7]  (A92050.)  Further, "amino acids 'derived from proteins' necessarily include those with post-translational modifications, natural or synthetic."  (A94078 ¶ 11; A94098 ¶ 45, A94106-07 ¶¶ 66-67.)  Thus, "[a]ccounting for such post-translational modifications dramatically increases the number of 'amino acids derived from proteins' [], making them essentially innumerable."  (A94106 ¶ 66; *see also* A94078 ¶ 11; A96387, 125:12-21, A96390, 134:7-135:23.)

Defendants also ignore that the amino acids described on page 7 of AU'168 are "optically active."  (A92050.)  "Optically active" does ***not*** mean "optically pure," i.e., only L- or D-series, a term used on the same page when describing

---

[7] Defendants rely heavily on "and the like" to broaden a list of salts to include undisclosed salts, yet selectively ignore the very same phrase in AU'168 to narrow a disclosure of amino acid conjugates.  (*Compare* APPBr.33, *with* APPBr.45.)

amphetamine.  (A92050; A96375-77, 77:20-82:5.)  "Optically active" includes a virtually infinite number of compounds because it includes amino acids in the L-configuration, the D-configuration, and various mixtures thereof.  (A94078 ¶ 11; A94097-98 ¶ 44, A94106 ¶ 64; A96375, 74:9-24.)  Moreover, AU'168's "preference" for the L-series concerns their use in products that are "of greater value [] therapeutic[ally]," which according to AU'168 are "substantially free from a central nervous system stimulatory effect."  (A92050, A92059.)  This ***teaches away*** from the claimed central nervous system stimulant compound.  *DePuy*, 567 F.3d at 1326.  (A57449; Section II.B.2 *supra*.)

As the district court determined, "Defendants do not propose a theory in which the skilled artisan has a reason to pick lysine from that group."  (A32.) Page 7 of AU'168 does not direct a POSA to any particular amino acid. Furthermore, Defendants ignore that AU'168 expressly describes the compounds of Formula VII as "***especially*** advantageous," and this group includes many ***D***-amino acids but does not include L-lysine.  (A92048-49 (emphasis added); A94079 ¶ 15; A96436, 319:16-320:13.)

### b. Defendants' New Argument Concerning Formula IV of AU'168 Should Be Rejected

For the first time, Defendants argue on appeal that Formula IV of AU'168 allegedly makes the claims obvious.  (APPBr.34.)  Defendants misleadingly assert that the district court overlooked this argument, but Defendants' prior Formula IV

CONFIDENTIAL MATERIAL REDACTED

argument was solely related to anticipation (an argument that was rejected by the district court, and not appealed).  (APPBr.34; A103505-07.)  "If a litigant seeks to show error in a trial court's overlooking an argument, it must first present that argument to the trial court.  In short, this court does not 'review' that which was not presented to the district court."  *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997).  Defendants' new argument on appeal should be rejected.

In any event, Formula IV does not support obviousness because it does not teach or suggest "a finite number of identified, predictable solutions."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).  Formula IV does ***not*** "define[] 'A' to be one of 17 amino acids, including lysine."  (APPBr.33.)  Defendants use hindsight to allege that a POSA would only look at the specific amino acids listed in Formula IV's part (a), while ignoring parts (b) and (c).  (APPBr.33; A92047.)



██████████████████████████████████████████████████

Formula IV encompasses "essentially innumerable" compounds ████████

███████████████████████████████████

Additionally, even part (a) is not a finite group of compounds because the

amino acids recited therein are "optically active," amphetamine's stereochemistry

is not defined, and there is no restriction on the salt form.  (A94078-79 ¶ 13;

A94097-98 ¶ 44, A94101 ¶¶ 49, 51, A94106 ¶ 64; A96374-75, 70:23-72:25, 74:9-

75:3.)  Thus, Defendants' reliance on Formula IV improperly "discounted the

number and complexity of the alternatives" and erroneously relies on hindsight.

*Ortho-McNeil*, 520 F.3d at 1364.

### c.    Defendants' New Argument Concerning Example 24 of AU'168 Should Be Rejected

Before the district court, Defendants did not argue that Example 24 of

AU'168 allegedly made the claims obvious.  (APPBr.34.)  Like their argument

regarding Formula IV (*supra*), Defendants' Example 24 argument related solely to

alleged anticipation (an argument that was rejected by the district court, and not

appealed).  (A26.)  Thus, Defendants' new argument on appeal should be rejected.

Defendants "cannot simply choose to make [their] arguments in iterative fashion,

raising a new one on appeal after losing on [their] other at the district court."

*Golden Bridge Tech., Inc. v. Nokia, Inc.*, 527 F.3d 1318, 1323 (Fed. Cir. 2008).

CONFIDENTIAL MATERIAL REDACTED

In any event, Defendants' new Example 24 argument is flawed.  Defendants argue that a POSA would find it obvious to modify Example 24 of AU'168 to make lisdexamfetamine.  But Defendants identify no motivation to modify Example 24, or a reasonable expectation of success that Example 24's compound could be transformed into lisdexamfetamine.  (APPBr. 34.)  Example 24 of AU'168 discloses a compound that includes $N^{\alpha}$-tosyl-L-lysine (which is different from the L-lysine in lisdexamfetamine).  (A92073.)  Defendants characterize the $N^{\alpha}$-tosyl portion as a "protecting group" for L-lysine, and allege that a POSA would be motivated to remove the $N^{\alpha}$-tosyl from Example 24's compound to make lisdexamfetamine.  (APPBr.9, 12, 34.)

According to Defendants, protecting groups "protect" reactive groups *only during synthesis* because otherwise the chemical reaction fails and forms byproducts.  (*See* APPBr.9-10.)  Assuming this to be the case (which it is not),[8] Defendants fail to explain why a POSA would understand the single $N^{\alpha}$-tosyl to be a synthetic protecting group despite the fact that L-lysine has *two* reactive groups.  (APPBr.9, 12.)  If a POSA were to attempt to synthesize lisdexamfetamine, *both* of L-lysine's amino groups would have to be protected, ████████████████████

---

[8] Defendants ignore the fact that protecting groups can also protect reactive groups in a final drug *in vivo*, *infra*.  (*See also* A96081 (notably, this article was published contemporaneously with AU'168 and appears to be authored by AU'168 co-inventor P. Quitt (*compare* A96079, *with* A92044)).)

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████     Thus, Example 24 is

not an intermediate synthesis product.

Indeed, AU'168 discloses Example 24 as a ***final*** product.  (A92070, A92073

(citing A92063).)  That Example 24 is a final product is consistent with

Formula VII's "especially advantageous" compounds, which includes

$N^\alpha$-tosyl-L-lysine (but, unlike lisdexamfetamine, not L-lysine).  (A92048-49; *see*

*also* A96081 (explaining that the $N^\alpha$-tosyl "protected derivative might in most

cases be the desired product"); *supra* n.8.)

Additionally, Defendants have not offered evidence that a POSA would have

a reasonable expectation of success with Defendants' proposed Example 24

modification.  As disclosed by the prior art[9] ████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

███████████     A96079, A96081).)  ████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

---

[9] *See* n.8 *supra*.

[10] ████████████████████████████████████████████████

████████████

CONFIDENTIAL MATERIAL REDACTED

████████████████████████  In view of Defendants' admissions, AU'168

does not provide a POSA with a reasonable expectation of success that Example 24

could be modified to make a mesylate salt of lisdexamfetamine.  (A92057.)

Defendants' argument that Example 24 would make a mesylate salt of

lisdexamfetamine obvious is wrong.  Defendants identify no prior art that describes

Example 24's properties or provides a reasonable expectation of success for

improving those properties.  Thus, Example 24 is not a lead compound that a

POSA would modify because "[a] lead compound . . . is a compound in the prior

art that would be most promising to modify in order to improve upon its activity

and obtain a compound with better activity."  *Otsuka*, 678 F.3d at 1291 (quotations

omitted).

### 3.    Defendants Fail to Identify How Miller Allegedly Overcomes AU'168's Deficiencies

Defendants made no showing that a POSA "would have had a reason to

select [AU'168's and Miller's compounds] from the panoply of known compounds

in the prior art," or how the "analysis is guided by evidence of the compound's

pertinent properties."  *Otsuka*, 678 F.3d at 1292.  Miller discloses broad formulas

to make "a new class of" metaraminol-based compounds.  (A92099-100, col.2

l.63-col.3 l.10.)   Miller's compounds, like those of AU'168 (*supra* Section II.B.2),

have different therapeutic properties than d-amphetamine and lisdexamfetamine

dimesylate.  (A94128-29 ¶¶ 127-129.) ████████████████████

██████████████████████████████████████████████

████████████████████████████████████████ In

contrast, lisdexamfetamine dimesylate is a central nervous system stimulant that

treats ADHD, which neither Miller nor AU'168 teach or suggest.  (A57449.)

Defendants did not identify evidence that a POSA "'would have been

motivated to combine the teachings of'" Miller and AU'168, or "'would have had

a reasonable expectation of success in doing so.'"  *Otsuka*, 678 F.3d at 1292

(quoting *Pfizer*, 480 F.3d at 1361).  Additionally, Defendants' allegation that the

"combination of Miller and AU'168" would make a "limited set of L-amino acid-

d-amphetamine conjugates" is plainly wrong.  (APPBr.35-36.)  Like AU'168,

Miller does not direct a POSA to a "limited set" of compounds because it is

directed to a large genus of compounds, namely those with aminoacyl portions

"derived from a naturally-occurring amino acid of the L series" or one of many

"acylated derivative[s] of" such amino acids.  (APPBr.35; A92099-100, col.2 l.63-

col.3 ll.2, col.3 ll.41-42.)  The chemical structure that Defendants included in their

brief is not found in Miller.  (*Compare* APPBr.14, *with* A92100.)  Thus, it is only

through hindsight that Defendants' expert Dr. Borch used Miller to devise a

compound that Defendants characterize as structurally "similar[]" to a mesylate

salt of lisdexamfetamine.  (APPBr.14 (quoting A92117), 35.)

Defendants' reliance on Miller's alleged structural similarity is insufficient as a matter of law.[11] "Absent a reason or motivation based on such prior art evidence [guided by evidence of the compound's pertinent properties], mere structural similarity between a prior art compound and the claimed compound does not inform the lead compound selection." *Otsuka*, 678 F.3d at 1292.

### 4. Defendants Do Not Identify How Abramić Overcomes AU'168's Deficiencies

Defendant's allegation that a POSA would combine Abramić with Miller and AU'168 is unsupported by the prior art. Defendants argue that "Abramić teaches that an aminopeptidase in the blood cleaves the amino acid off of Abramić's conjugates to release 2NA," and that "L-lysine" is allegedly one of the best amino acids to use. (APPBr.36.) But in contrast to Defendants' argument, Abramić discloses "classify[ing]" an isolated enzyme, and propounds "a new isolation procedure for this enzyme [that] was developed" and allowed for "the study of its properties." (A107695.) Abramić does not refer to any therapeutic effects of 2NA (2-naphthylamide, a known carcinogen), or even show the chemical structure of the 2NA compound. (A107695.)

Thus, Defendants' argument concerning Abramić suffers from the hindsight reasoning that permeates Defendants' other obviousness arguments. Defendants

---

[11] Metaraminol differs from d-amphetamine in several important chemical respects, including substitutions on the benzene ring and the presence of a hydroxyl group in the aliphatic side chain. (APPBr.13; A94128-29 ¶¶ 127-129.)

identify no prior art that would provide a reason for a POSA to look at Abramić in

combination with AU'168 and Miller to solve any known problem with

d-amphetamine, let alone provide a reasonable expectation of success in doing so.

*Otsuka*, 678 F.3d at 1292.

*    *    *

Defendants improperly started with the invention and worked backwards,

"retrac[ing] the path of the inventor with hindsight, discount[ing] the number and

complexity of the alternatives, and conclud[ing] that the invention . . . was

obvious." *Ortho-McNeil*, 520 F.3d at 1364.  Indeed, the fact that AU'168 and

Miller were each 30 years old, and Abramić was over 10 years old by the priority

date of the patents-in-suit "evinces that the . . . claimed invention was not obvious

to try." *Leo*, 726 F.3d at 1356 (finding a decade of elapsed time to be evidence of

hindsight).

### 5. Alleged "Similarities" with the Prior Art Do Not Make the Claimed Compound Obvious to Try

Defendants wrongly argue that alleged "similarities between the prior-art

references and claimed subject matter" would make the invention a "'combination

of familiar elements.'"  (APPBr.37, 38 (quoting *KSR*, 550 U.S. at 416).)

Defendants give no reason why a POSA would "try" conjugating d-amphetamine

to any of the amino acids in AU'168.  (APPBr.42.)  Defendants also give no reason

why a POSA would disregard the "examples [that] are intended to illustrate"

32

AU'168.  (A92060-75.)  "When a field is unreduced by direction of the prior art, and when prior art gives no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful, an invention is not obvious to try."  *Unigene*, 655 F.3d at 1361 (quotations omitted).

Nevertheless, Defendants improperly use hindsight to argue that "a trier of fact could have found that to arrive at [lisdexamfetamine], a POSA would have been motivated to combine the known elements of L-lysine with d-amphetamine according to known methods for making conjugates in AU'168, to yield [lisdexamfetamine], and such a person would have reasonably predicted [lisdexamfetamine's] properties as a prodrug."  (APPBr.38 (citing A107383).)  Defendants employ hindsight and start with the invention in mind, and give no explanation of why a POSA would try to combine such components.  Defendants made no showing that "the possible options skilled artisans would have encountered were 'finite,' 'small,' or 'easily traversed,' and that skilled artisans would have had a reason to select the route that produced the claimed invention."  *Cyclobenzaprine*, 676 F.3d at 1072.  Furthermore, Defendants' "obvious to try" arguments are facially deficient because they concern lisdexamfetamine, which ignores that the compound-at-issue is a mesylate salt of lisdexamfetamine.  (Section II.A *supra*.)

Defendants also identify no prior art that would show why a mesylate salt of lisdexamfetamine would be a possible solution to any known problem. Defendants only generally allege that "d-amphetamine has undesirable side effects," and that it is "a common goal in the pharmaceutical industry [] to reduce side effects while maintaining efficacy."[12] (APPBr.42.) Such general and conclusory "reasons" are insufficient as a matter of law because to be obvious to try there must be a "good reason" to solve a "known" problem in the prior art. *KSR*, 550 U.S. at 421; *Leo*, 726 F.3d at 1356-57. Defendants were required to show "that a [POSA] would have appreciated the need" to develop the claimed invention. *In re Omeprazole*, 536 F.3d 1361, 1380 (Fed. Cir. 2008). "Only after recognizing the existence of [a] problem would [a POSA] *then* turn to the prior art and attempt to develop" a solution. *Leo*, 726 F.3d at 1354 (emphasis in original).

Defendants "do not point to anything which supports the inference that these are solutions to a particular problem, and certainly not that they are predictable." (A33.) In a situation where "[t]he problem was not known, the possible approaches to solving the problem were not known or finite, and the solution was not predictable[,] [] the claimed invention would not have been obvious to try to [a POSA]. Indeed [a POSA] would not have thought to try at all because they would not have recognized the problem." *Leo*, 726 F.3d at 1356-57.

---

[12] Defendants' allegation ignores Defendants' admission that "FDA has long approved d-amphetamine as safe and therapeutically effective." (APPBr.32.)

### 6.    Defendants' Reliance on *BMS* Is Unfounded

Defendants are wrong to argue that *BMS* "compels" finding a genuine issue of material fact as to obviousness.  (APPBr.38-39 (citing *Bristol-Meyers Squibb Co. v. Teva Pharm. USA, Inc.* ("*BMS*"), 752 F.3d 967, 974-77 (Fed. Cir. 2014)).) *BMS* concerned the claimed compound entecavir.  *Id.* at 969-70.  In *BMS* the lead compound, 2'-CDG, was being extensively researched "during the relevant time period," and was "a very exciting lead compound to work from."  *Id.* at 971.  There was "a reasonable expectation of success of creating a compound with beneficial antiviral properties," based on "(1) the structural similarity between entecavir and 2'-CDG, (2) the teachings of the [prior art], (3) the finding that the [] substitution would be a small, conservative change and (4) the totality of the prior art on 2'-CDG."  *Id.* at 972 (quotations omitted).  Here, Defendants lack such evidence. Defendants' prior art does not provide a reason to modify d-amphetamine, or give a reasonable expectation of success in making such modifications.

Additionally, Defendants' allegations that "d-amphetamine and [lisdexamfetamine] are structurally similar" and the modifications are "small and conservative" are unsupported and meritless.  (APPBr.39.)  Contrary to Defendants' assertion, obviousness is not based on merely "yield[ing] a pharmaceutical compound."  (APPBr.39.)  Defendants were required to identify evidence that shows "a sufficiently close relationship to create an expectation, in

light of the totality of the prior art, that the new compound will have similar

properties to the old." *Otsuka*, 678 F.3d at 1293 (quotation omitted).

Finally, Defendants' allegation that the combination of Miller and AU'168 is

a "minor modification" that makes "an amphetamine drug substance" that

"free[s] . . . d-amphetamine[] in a way that regulates its release and reduces its side

effects" is a product of pure hindsight.  (APPBr.40.)  As this Court explained:

> [I]t is the possession of promising useful properties in a lead compound that motivates a chemist to make structurally similar compounds.  Yet the attribution of a compound as a lead compound after the fact must avoid hindsight bias; it must look at the state of the art *at the time the invention was made* to find a motivation to select and then modify a lead compound to arrive at the claimed invention.  Accordingly, proving a reason to select a compound as a lead compound depends on more than just structural similarity, but also knowledge in the art of the functional properties and limitations of the prior art compounds.

*Daiichi Sankyo Co., Ltd. v. Matrix Labs., Ltd.*, 619 F.3d 1346, 1354 (Fed. Cir.

2010) (emphasis in original, quotations and citations omitted).  Defendants did not

identify such prior art.

### 7.    The District Court Considered the Scope and Content of the Prior Art

Defendants wrongly argue that the district court failed to consider Miller and

Abramić, Formula IV of AU'168, and the alleged "structural similarity between"

AU'168's and Miller's compounds.  (APPBr.40.)  As to Miller and Abramić,

Defendants ignore that the district court expressly considered the "two other

references" that Defendants cited, and found them unavailing.  (A33 n.7;

APPBr.41.)  Indeed, Defendants only gave Abramić a passing mention in their

supplemental summary judgment brief and at oral argument.  (A107821; A107960-

62.)  Defendants' allegation that the district court "overlooked the evidence

provided by" their expert Dr. Borch is also meritless because it is not the district

court's responsibility to identify arguments that Defendants did not make in their

briefing.  (APPBr.41.)  "District judges are not archaeologists, and it was not the

court's burden to excavate masses of papers in search of revealing tidbits to help"

Defendants meet their burden.  *Hoffmann-La Roche Inc. v. Apotex Inc.*, 496 F.

App'x 46, 52 (Fed. Cir. 2012) (quotation omitted).  Finally, Defendants did not

argue that Formula IV of AU'168 allegedly made the claims obvious to the district

court.  (*Supra* Section II.B.2.b.)

Defendants have no basis to allege that the district court failed to consider

any evidence that Defendants identified.  The district court carefully considered

Defendants' prior art, the summary judgment briefing, oral argument, and the

supplemental briefing that the district court requested *sua sponte*.  After

considering Defendants' arguments and evidence, the district court correctly

concluded that "Defendants have not clearly articulated the design need or market

pressure to solve a problem" and did not explain why the "amino acids stated in

AU'168 form a finite number of identified and predictable solutions to this problem." (A33 & n.7.)

### C. Defendants' "Proposition" That the Obviousness Analysis Could Begin With the Assumption That Lisdexamfetamine Is Anticipated Should Be Rejected

Defendants wrongly argue that "a proper obviousness analysis regarding the dimesylate salt of [lisdexamfetamine] could also begin from the proposition that [lisdexamfetamine] is disclosed in the prior art." (APPBr.50.) Defendants are not "entitled to such a presumption." (A26 n.5.) In any event, the district court correctly found that "Defendants have not offered the prior art reference that discloses lisdexamfetamine. [Thus,] [t]his Court need not reach the legal question of whether Defendants may be excused from satisfying the requirements of the lead compound analysis, since they have failed to establish the key assumption on which their argument depends." (A29.)

### 1. Defendants' Legally-Flawed Hybrid-Obviousness Argument Suffers from a Failure of Proof

Defendants argue that this Court should adopt a hybrid theory of obviousness, which uses anticipation law from *Wrigley*, *Finisar*, *Petering*, and *Schaumann* to first find lisdexamfetamine, and then obviousness law to find a mesylate salt of lisdexamfetamine. (APPBr.51-54.)

"Defendants' approach to the obviousness inquiry is problematic from the start." (A29.) Defendants cite no law that supports dividing a chemical compound

and considering its parts piecemeal—using an anticipation analysis for one part

and an obviousness analysis for the rest.  Anticipation and obviousness are separate

and distinct concepts that are evaluated under separate statutory provisions.

35 U.S.C. §§ 102, 103; *Jones v. Hardy*, 727 F.2d 1524, 1529 (Fed. Cir. 1984).

This Court should reject Defendants' hybrid approach to invalidity.

Defendants' suggestion that *Pfizer* somehow sanctions this "proposition" is

meritless.  (APPBr.50-51.)  Defendants mischaracterize *Pfizer* as having

considered "new salts of active drug substances anticipated by the prior art."

(APPBr.50-51.)  Defendants are wrong because *Pfizer*'s particularized facts

considered, *inter alia*, whether the amlodipine besylate acid addition salt was

obvious in light of the fact that another salt of amlodipine (amlodipine maleate)

was a known lead compound.  (*Supra* Section II.A.4.)  *Pfizer* did not use the

hybrid-obviousness approach urged by Defendants.

Defendants' argument is also premised by the incorrect assumption that the

lead compound analysis does not apply to salts.  (APPBr.50-51.)  Defendants'

assumption is contradicted by this Court's precedent, which explains that the lead

compound "analysis is guided by evidence of the compound's pertinent

properties," such as "the 'strength, solubility, and other known chemical

characteristics' of a prior art salt-forming acid."  *Otsuka*, 678 F.3d at 1292 (quoting

*Pfizer*, 480 F.3d at 1363).  This Court's lead compound analysis for salts is the

correct approach because salts significantly affect a compound's pertinent properties. For example, Defendants' expert Dr. Atwood explained that "different salts have different [properties], and can affect formulation characteristics of the drug. Different salts can prolong the action of a pharmaceutical agent, [and] can have different pharmacokinetic properties . . . ." (A63638-39, 205:15-208:10 (quotations omitted); *see also* A62597 ¶ 29.)

In any event, even under Defendants' hybrid-obviousness theory, Defendants still lack evidence that: (i) lisdexamfetamine or a salt thereof was known; (ii) its properties were known; (iii) there was any problem that would motivate a POSA to try a mesylate salt; and (iv) there was a reasonable expectation of success in doing so. (APPBr.50.)

### 2. Defendants' Anticipation Analysis in Their Hybrid-Obviousness Argument Is Also Flawed

Defendants further misapply this Court's precedent by erroneously combining *Wrigley*'s analysis with the very different genus-species analysis of *Petering* and *Schaumann*. (APPBr.51-52.) *Petering* and *Schaumann* concern anticipation of a species when a small genus is disclosed. (APPBr.51-52 (citing *In re Petering*, 301 F.2d 676 (C.C.P.A. 1962); *In re Schaumann*, 572 F.2d 312 (C.C.P.A. 1978)).) In contrast, *Wrigley* was "***not*** a case in which the prior art reference merely disclose[d] a genus and the claim at issue recites a species of that genus." *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1361

(Fed. Cir. 2012) (emphasis added).  Defendants' legally-flawed arguments should be rejected.

> **a.    A POSA Would Not "Immediately Envision" All of the Compounds Disclosed on AU'168's Page 7 or by Formula IV**

Defendants wrongly argue that a POSA would "immediately envision" all of the conjugates disclosed in AU'168 on page 7 and by Formula IV.  (APPBr.51-52.) Defendants are wrong because a genus is anticipatory only when a POSA "would, on reading the [reference], at once envisage *each member of [a] limited class*." *Petering*, 301 F.2d at 681 (emphasis added).  Neither page 7 nor Formula IV constitutes a "limited class" of compounds from which "each member" can be immediately envisioned.  Instead, AU'168's page 7 and Formula IV disclose innumerable compounds.

Defendants' argument that a POSA would selectively look to page 7 of AU'168 and "immediately envision" all of the disclosed conjugates should be rejected.  (APPBr.51.)  As explained *supra* Section II.B.2.a, page 7 of AU'168 discloses an open-ended genus with an innumerable number of optically active amino acids "represented, preferably, by those derived from proteins . . . and the like," and "[a]mphetamine in all its stereochemical forms, including its racemate." (A92050.)

As to AU'168's Formula IV's single "class" of compounds, ███████

█████████████████████████████████████████████████████████

████████████████████████████  As explained *supra* Section

II.B.2.b, Defendants' allegation that Formula IV can be read as "17 conjugates"

requires that a POSA use hindsight to ignore almost all of the disclosed "class,"

including the "optically active" amino acids of part (a), and all of parts (b) and (c).

In view of the innumerable compounds covered by Formula IV and page 7,

AU'168 "does not disclose [], and therefore, cannot enable" and "cannot

anticipate" lisdexamfetamine.  *Impax Labs., Inc. v. Aventis Pharm., Inc.*, 468 F.3d

1366, 1383 (Fed. Cir. 2006) (finding that "hundreds" of compounds cannot

anticipate an unnamed compound).

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████  The PTO examiner also did not envision

lisdexamfetamine in AU'168 because the '787 patent's lisdexamfetamine

(freebase) claims issued over the reference.  (A583, A673.)  Furthermore, in

response to a patent opposition filed by some Defendants, the European Patent

Office did not find lisdexamfetamine disclosed in AU'168.  (A85592 (quoting A86376).)

Petering and *Schaumann* do not support Defendants' arguments. (APPBr.51-52.)  *See Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*, 471 F.3d 1369, 1376 (Fed. Cir. 2006) (explaining that in *Petering* and *Schaumann* the prior art "expressly spelled out a definite and limited class of compounds that enabled a [POSA] to at once envision each member of this limited class"); *In re Ruschig*, 343 F.2d 965, 974 (C.C.P.A. 1965) (explaining that *Petering* does not allow "the mechanistic dissection and recombination of the components of the specific illustrative compounds in every chemical reference [] to create hindsight anticipations").

### b.    *Wrigley* and *Finisar* Do Not Support Finding Chemical Compounds Obvious

*Wrigley* concerned recipes for making chewing gum—not new chemical compounds.  There, a prior art reference "disclose[d] a number of different combinations of cooling and flavoring elements" that could be combined.  *Wrigley*, 683 F.3d at 1361.  While *Wrigley* concerned ingredients in a chewing gum recipe, here "[t]here is no dispute that some chemical reactions have to take place, including synthesizing a protected intermediate and then performing a reaction which deprotects that intermediate" to form a compound.  (A26-27.)  Thus, "[t]he instant case is not analogous to *Wrigley*."  (A27.)

43

The extent to which Defendants' obviousness arguments are far afield from *Wrigley* is evident by Defendants' reliance on it to allege anticipation by "combining" Example 24's final compound that includes an $N^{\alpha}$-tosyl "protecting group" with a different disclosure about removing protecting groups.  (APPBr.52, 54.)  As the district court explained, "[c]ombining formula ingredients picked from two separate lists (as in *Wrigley*) is not analogous to 'combining' a compound (protected lisdexamfetamine) with a technique (deprotection)."  (A27.)  *Wrigley*'s anticipation analysis does not apply and, as explained *supra* Section II.B.2.c, Example 24 does not make a mesylate salt of lisdexamfetamine obvious.

Defendants also cite *Finisar*, but it, too, is off-point.  (APPBr.52-53.) *Finisar* concerned the interpretation of a reference in which "th[e] court consult[ed] the overall context of a passage" to determine the "meaning [of words] according to their placement in grammatical structure."  *Finisar Corp. v. The DirecTV Grp., Inc.*, 523 F.3d 1323, 1336 (Fed. Cir. 2008).  In *Finisar*, this was important because "to anticipate, there must be no difference between the claimed invention and the reference disclosure, as viewed by a [POSA] in the field of the invention" and the placement of a comma could change the interpretation of a passage.  *Id.*  Thus, *Finisar*'s reasoning is also inapplicable to the obviousness of a new chemical compound.

### D.    Defendants Did Not Address the Dependent Claims

Defendants wrongly suggest that the obviousness of the dependent claims is not at issue on appeal.  (APPBr.6.)  Defendants ignore that Shire argued and the district court found that the asserted independent *and* dependent compound claims are nonobvious.  (A19, A36.)  Each dependent claim is presumed valid independently of the validity of any other claim.  35 U.S.C. § 282(a); *Bausch & Lomb*, 796 F.2d at 445, 446-47.  Defendants did not identify evidence to support a *prima facie* case of invalidity for any asserted claim.  (A19, A36.)  Thus, the district court's judgment that dependent claims 2-4 of the '630 patent and claims 2-7 and 9-12 of the '253 patent are not invalid should be affirmed.

### III.    Defendants Identified No Evidence to Support Their Burden to Overcome the Validity of Method Claim 4 of the '486 Patent

Before the district court, Defendants all but ignored method claim 4 of the '486 patent, which is directed to "[a] method of treating a patient having [ADHD], comprising orally administering to the patient in need thereof a pharmaceutically effective amount of . . . a mesylate salt of [lisdexamfetamine]."  (A135, claims 1, 3, 4; A34-35; A107964, 84:8-12.)

Defendants' expert Dr. Feifel also ignored method claim 4 in his expert reports.  (A92860 ¶ 29; A63647 ¶ 8.)  Consequently, Defendants' supposed "evidence" is a statement in Dr. Feifel's deposition that his opinions "may [] include the mesylate salt."  (A35.)  The district court correctly found that "Feifel's

deposition statement does not even rise to the level of a conclusory statement of obviousness," and "is not sufficient to transform Feifel's expert report from a report which does not include claim 4 within its scope into a report that does." (A35.)  "Mere denials and conclusory statements [] are not sufficient to establish a genuine issue of material fact."  *McElmurry v. Ark. Power & Light Co.*, 995 F.2d 1576, 1578 (Fed. Cir. 1993).

Defendants wrongly argue that Dr. Feifel's general opinions on claim 1's "underlying subject matter" would "cover[] the subject matter of claim 4." (APPBr.56-57.)  Unlike claim 1, claim 4 specifically claims a method for treating ADHD using *a mesylate salt* of lisdexamfetamine.  (APPBr.56-57.)  Dr. Feifel did not explain why a POSA would specifically use a mesylate salt of lisdexamfetamine to treat ADHD, or why a POSA would reasonably expect a mesylate salt to be successful.  ██████████████████████████

████████████████████████████████████████████

██████  Thus, Dr. Feifel's general opinion on a different claim does not satisfy Defendants' burden to identify clear and convincing evidence that claim 4's method of treatment using specifically a mesylate salt of lisdexamfetamine would be obvious.  *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 24-25 (Fed. Cir. 2012) (explaining that each patent claim is presumed valid independently of the validity of other claims, and general opinions are not substantial evidence of

invalidity); *Bausch & Lomb*, 796 F.2d at 445, 446-47 (finding that court must

consider validity of dependent and independent claims separately); *see also* 35

U.S.C. § 282(a).

Defendants' failure of proof is not remedied by Dr. Feifel's general opinions

about "the use of d-amphetamine to treat ADHD." (APPBr.56.) *See Jones*, 727

F.2d at 1529 ("Failure to consider the claimed invention as a whole is an error of

law."). As the district court explained:

> [T]he foundation of Defendants' argument that the
> method of claim 4 is obvious [is that] it was well-known
> that amphetamine compounds can be used to treat
> ADHD. The problem is that, without more, this is an
> "obvious to try" argument. On that basis, it would be
> obvious to try every possible amphetamine compound as
> a treatment for ADHD. Defendants have not even
> suggested that the set of all possible amphetamine
> compounds can be said to be a "finite number of
> identified, predictable solutions."

(A34 n.8 (quoting *KSR*, 550 U.S. at 421).) Furthermore, Defendants identified no

prior art that would provide a POSA with a motivation to specifically administer a

mesylate salt of lisdexamfetamine for treatment of ADHD with a reasonable

expectation of success. *Unigene*, 655 F.3d at 1360-61.

Defendants also argue that Dr. Feifel's opinions on "claim 13 of the '253

patent" should make claim 4 of the '486 patent obvious. (APPBr.57.) Defendants

did not make this argument to the district court and this new argument on appeal

should be rejected. Defendants "cannot simply choose to make [their] arguments

in iterative fashion, raising a new one on appeal after losing on [their] other at the district court." *Golden Bridge*, 527 F.3d at 1323. Regardless, the '253 patent is a continuation-in-part of the '486 patent, and different subject matter is claimed. (A333 ¶ (63); A476; APPBr.57-58.) Dr. Feifel's opinion about a different claim in a different patent is not evidence of invalidity as to claim 4 of the '486 patent. *See Whitserve*, 694 F.3d at 24-25. And even accounting for this claim, Dr. Feifel still does not explain why a POSA would specifically use a mesylate salt of lisdexamfetamine to treat ADHD, or why a POSA would reasonably expect a mesylate salt to be successful.

Defendants further argue that Dr. Feifel was "relying on defendants' other experts," specifically "Atwood, who opined that the mesylate salt was obvious over the prior art." (APPBr.55, 57.) As the district court explained, "[t]he reference to Atwood's expert opinion is misleading at best." (A34.) "Atwood [] is Defendants' expert on salt selection" and his "expert report does not address methods of treatment for ADHD." (A34.) Accordingly, contrary to Defendants' assertions, the district court "consider[ed] Atwood's opinion." (APPBr.58, 59.)

Dr. Atwood's opinions concerned "chemical compounds," and not "a method of treating ADHD." (APPBr.59.) The alleged obviousness of a method of treatment is a separate inquiry from the alleged obviousness of a compound. *See Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1294 (Fed. Cir. 2011); *Loctite Corp.*

48

*v. Ultraseal, Ltd.*, 781 F.2d 861, 875 (Fed. Cir. 1985).  And Dr. Atwood conceded

that the "properties of any [salt] form [are] ***impossible to predict***."  (A62597 ¶ 29;

A63638-39, 205:15-208:10 (emphasis added).)  Dr. Atwood's opinions do not cure

Defendants' failure of proof as to the claimed method.

The district court's judgment that claim 4 of the '486 patent is not invalid

should be affirmed.

## IV. Defendants' Last-Minute Request to Assert a New Invalidity Contention Was Properly Denied

Defendants have only themselves to blame for the district court's denial of

their motion to amend their contentions.  Defendants' proposed contention was to

allege that the services provided by the contract manufacturers of Vyvanse® would

be an anticipating sale under the on-sale bar for the '253 patent.  (A56473 & n.2.)

Defendants waited until September ***2013*** to file their motion, despite the fact that

"[i]n May of ***2012***, Shire provided documentation identifying [the companies]

providing manufacturing services."  (A55652; A56473 & n.2 (citing A55654).)

"Decisions enforcing local rules in patent cases will be affirmed unless

clearly unreasonable, arbitrary or fanciful; based on erroneous conclusions of law;

clearly erroneous; or unsupported by any evidence."  *O2 Micro Int'l, Ltd. v.*

*Monolithic Power Sys.*, 467 F.3d 1355, 1366-67 (Fed. Cir. 2006).  The district

court committed none of these errors.

The District of New Jersey's Local Patent Rules "are designed to encourage parties to provide early notice of their infringement and invalidity contentions, and to proceed with diligence in amending those contentions when new information comes to light in the course of discovery." (A107829 (citing *O2 Micro*, 467 F.3d at 1364-66).) Contentions may be amended only when "(1) the moving party makes a timely application to the court; (2) there is good cause for the amendment; and (3) there is no undue prejudice to the adverse party." (A56470 (citing D.N.J. L. Pat. R. 3.7).)

Defendants' motion was not timely because Defendants "concededly had all the information which they needed" to request this amendment for months, but waited until "just nine days before fact discovery closed" to file their motion. (A107829.) Indeed, the parties appeared at a scheduling conference before the district court between these events, but Defendants remained silent about this issue. (A56474.) The district court found "that Defendants' explanations for the proposed amendment were too little and too late, given the stage of the litigation." (A107829-30.) The magistrate judge in the first instance, and the district court judge (on Defendants' appeal of the magistrate judge's decision) correctly denied Defendants' motion. (A56469; A107828.) "'[I]f the parties were not required to amend their contentions promptly after discovering new information, the contentions requirement would be virtually meaningless as a mechanism for

shaping the conduct of discovery in trial preparation.'" (A56473 (quoting *O2 Micro*, 467 F.3d at 1366).)

Defendants also failed to "demonstrate[] good cause to amend their" contentions. (A56476.) Good cause requires a "recent discovery of material prior art despite earlier diligent search." (A56474-75 (quotation omitted, citing D.N.J. L. Pat. R. 3.7(b); *O2 Micro*, 467 F.3d at 1366).) The district court found that "the record reflects no real diligence in pursuing information concerning this issue." (A107829.) Indeed, Shire produced documents containing the information over a year before Defendants' motion. (A56473 & n.2 (citing A55654).) As the district court explained, "[i]t is Defendants' burden to conduct a diligent search for prior art [and] [t]his includes taking reasonable measures to review documents." (A56476.)

Finally, Defendants' delay ensured that fact discovery had ended and the parties' opening expert reports were due ***before*** the district court would hear Defendants' motion. (A55652.) Thus, the district court correctly found that permitting an amendment at that juncture "would [] delay the case" and "cause undue prejudice to Shire." (A56477.)

The district court's enforcement of the Local Patent Rules should be affirmed. Defendants made no showing that the district court committed clear error or was arbitrary.

## V.  The District Court Correctly Found JM Liable for Induced Infringement of the Compound Claims

JM's argument that section 271(e) "cannot support" an infringement claim against it is meritless.  (JMBr.29 (citing 35 U.S.C. § 271(e)).)  The district court correctly held JM liable for induced infringement under sections 271(e)(2) and 271(b) based on this Court's precedent in *Forest Labs., Inc. v. Ivax Pharm., Inc.*, 501 F.3d 1263 (Fed. Cir. 2007).  (A21-22.)  *See* Section V.A *infra*.

Critically, JM ignores its liability under section 271(e)(2) for its ***future*** infringement under section 271(b) as the ANDA-filers' API supplier.  Instead, JM attempts to redirect the issue to whether its ***past*** infringement is protected by the section 271(e)(1) safe harbor (an argument that JM did not make before the district court when opposing summary judgment), and whether there has been any actual infringement to date.  (JMBr.24; A103521-25.)  Thus, JM does not dispute that it ***is*** liable for its ***future*** infringement under sections 271(e)(2) and 271(b).  In any event, to the extent that JM was even within the safe harbor, JM's admitted commercial activities propelled it out of the safe harbor, and makes it liable for infringement under sections 271(a) and (b), independently of section 271(e)(2).

Additionally, JM and GPhA are wrong to argue that injunctive relief is unavailable to prevent JM from commercially making and selling its infringing API because section 271 and *Forest* provide for such relief.[13]

### A.    *Forest* Is Controlling Precedent, and Principles of *Stare Decisis* Compel Affirming the District Court's Judgment

JM argues that *Forest* should be disregarded because its reasoning and holdings are allegedly "dictum" and do "not justify seeking to hold or holding" JM liable for induced infringement.  (JMBr.37, 38, 40.)  JM's views are irreconcilable with *Forest*.

Like the present case, *Forest* concerned a compound patent and the issue of whether the section 271(e)(1) safe harbor "exempt[ed]" an API supplier (Cipla) from an induced infringement claim under section 271(e)(2), given that "Cipla [was] the intended supplier of [API] to [ANDA-filer] Ivax and contributed information for the filing of the ANDA."  501 F.3d at 1265, 1272.

*Forest* held the API supplier liable for infringement under section 271(e)(2), deciding that the API supplier will induce infringement of a compound patent under section 271(b) by "induc[ing] the acts of the [ANDA-filer] that ***will*** constitute direct infringement upon approval of the ANDA."  501 F.3d at 1272

---

[13] JM's argument that Shire allegedly "gets nothing—besides discovery" by including it as a party is revealing.  (JMBr.4, 32.)  During discovery, the ANDA-filers used the "confidential" designation of JM's DMF as a shield to withhold information about the API used in their ANDAs.  (*E.g.*, A7219-20.)  In any event, Shire additionally seeks injunctive relief against JM.  (*E.g.*, A51173 ¶ xix.)

(emphasis added).  *Forest* explained that section "271(e)(2) defines [the ANDA-filer's] filing of its ANDA as an infringement," and even though the API supplier "did not file the ANDA, [] when the question of an injunction against commercial activity arises, [the API supplier] is as culpable, and hence entitled to be enjoined, as [the ANDA-filer]."  501 F.3d at 1272.

Thus, *Forest* determined that section 271(e)(2) may be asserted against API suppliers for induced infringement based on the ANDA-filer's ***future*** direct infringement.  501 F.3d at 1272.

Accordingly, principles of *stare decisis* compel affirming the district court's judgment that JM induced infringement.  "Panels of this court are bound by previous precedential decisions until overturned by the Supreme Court or by this court *en banc*."  *Barclay v. United States*, 443 F.3d 1368, 1373 (Fed. Cir. 2006). *Stare decisis* strongly applies to statutory interpretation, as is the case with *Forest*, because "[t]he presumption that a court will adhere to its prior rulings has 'special force' for precedents that resolve non-constitutional issues, for 'Congress remains free to alter what [the courts] have done.'"  *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272, 1282 (Fed. Cir. 2014) (en banc); *see Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2411 (2014).  Neither JM nor GPhA have made any showing as to why *stare decisis* does not apply here.

### 1. There Is No Basis to Depart from *Forest* Because *Forest* Cannot Be Distinguished

JM is liable for infringement based on *Forest*. In *Forest*, API-supplier Cipla similarly argued that "provi[ding] information to Ivax for its filing of the ANDA" was not an infringing act. 501 F.3d at 1271. *Forest* rejected Cipla's arguments, and found that "[s]ection 271(e)(2) may support an action for induced infringement." 501 F.3d at 1272.

Here, it is undisputed that the ANDA-filers used JM's API in their products, JM provided access to its DMF to assist the ANDA-filers, and JM's API directly infringes the compound claims. (A20-21.) Thus, like *Forest*, "the plan to manufacture, [] market, and sell the [] products described in the ANDA[s] w[as] undoubtedly a cooperative venture, and [JM] was to manufacture and sell infringing [API] to [the ANDA-filers] for [sale] in the United States." 501 F.3d at 1272. "[JM] has therefore actively induced the acts of [the ANDA-filers] that will constitute direct infringement upon approval of the ANDAs." *Id.*

#### a. The Stipulation in *Forest* Does Not Change Its Holding

JM alleges that *Forest* is distinguishable because there the API supplier stipulated to infringement. (JMBr.23, 36, 40.) JM is mistaken. In *Forest*, the parties stipulated that the ***product*** (compound) directly infringed. 501 F.3d at 1266. Here, the district court found that "[t]here is no real dispute about the ANDA-Defendants' direct infringement of the compound claims," and that ruling

was not appealed.  (A20; APPBr.1-2; JMBr.4-5.)  Additionally, "JM admits that

[it] has made, sold and/or offered for sale lisdexamfetamine dimesylate API."

(*E.g.*, A54845 ¶ 39.)  Thus, *Forest*'s stipulation is, if anything, a distinction

without a difference.

Forest is squarely on-point because it concerned an API supplier that "did

not file an ANDA" and, like here, no ANDA product had launched.  (JMBr.36.)

*Forest* determined that "[u]nder the standards for inducement which we apply to

35 U.S.C. § 271(b), [the API supplier] has therefore actively induced the acts of

[the ANDA-filer] that will constitute direct infringement upon approval of the

ANDA."  501 F.3d at 1272.  Thus, contrary to JM's assertion, "*Forest* [] actually

makes clear" that the district court correctly held JM liable for induced

infringement.  (*See* JMBr.36.)

### 2.    JM's Argument That Induced Infringement Standards Differ between Method and Compound Claims Is Mistaken

JM argues that *Forest*'s "principle [] originated under very different

circumstances."  (JMBr.38.)  Simply because *Forest* cited cases concerning

method claims, JM alleges that *Forest* misapplied the "holdings of *Allergan* and

*Warner-Lambert*."  (JMBr.38-39.)  JM is wrong to suggest that induced

infringement under section 271(e)(2) is limited to methods of use.  Indeed, *Forest*

found induced infringement of a compound patent, as is the case here.  501 F.3d at

1266, 1272.

### 3.     JM's Jurisdictional Argument Is Belied by the Injunction Granted in *Forest*

In a footnote, JM suggests that the Declaratory Judgment Act should have been cited as a basis for jurisdiction.  (JMBr.34-35 n.7.)  JM ignores that jurisdiction is proper under 28 U.S.C. section 1338(a) and 35 U.S.C. section 271(e)(2).  Furthermore, *Forest* found injunctive relief to be a proper *remedy* for an API supplier's induced infringement based on sections 271(e)(2) and 271(b).  501 F.3d at 1272.  A court cannot provide a remedy without jurisdiction.  *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) (explaining that subject matter jurisdiction cannot be waived or forfeited).  Moreover, even if the safe harbor protected JM (which it does not), there is still jurisdiction here because the safe harbor is not a jurisdictional bar.  *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 132 S. Ct. 1670, 1680 n.5 (2012).

### B.     JM Ignores Its Liability under Section 271(e)(2) for Future Infringement under Section 271(b)

JM misses the point when it argues that "section 271(e) prevents a finding of infringement."[14]  (JMBr.28.)  JM ignores that its conduct related to the other Defendants' ANDA filings allows section 271(e)(2) to support an induced

---

[14] JM's arguments relying on *United Therapeutics* (JMBr.29, 30, 34-35 n.7) should be afforded no weight because it is an unpublished opinion that did not cite *Forest*. *See United Therapeutics Corp. v. Sandoz Inc.*, No. 3:13-cv-316 (D.N.J. Mar. 31, 2014), ECF No. 88, *passim*.

infringement action under section 271(b) for JM's *future* infringement upon approval of the ANDAs. *Forest*, 501 F.3d at 1272.

Section "271(e)(2) is designed to create an artificial act of infringement for purposes of establishing jurisdiction." *Glaxo Grp. Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1351 (Fed. Cir. 2004). Filing an ANDA is a "defined act of infringement," and the infringement "inquiry in a suit brought under § 271(e)(2) is the same as it is in any other infringement suit." *Glaxo Inc. v. Novopharm Ltd.*, 110 F.3d 1562, 1569 (Fed. Cir. 1997). While section 271(e)(2) "is not a jurisdictional statute in the strict sense of the word," it is designed to "make[] it possible for the district court to exercise its section 1338(a) jurisdiction in the situation in which an ANDA has been filed." *Allergan*, 324 F.3d at 1330.

"Once jurisdiction is established, however, the substantive determination whether actual infringement or inducement *will* take place is determined by traditional patent infringement analysis, just the same as it is in other infringement suits, including those in a non-ANDA context, the only difference being that the inquiries now are hypothetical because the allegedly infringing product has not yet been marketed." *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1365-66 (Fed. Cir. 2003) (emphasis added). "The proper inquiry under § 271(e)(2)(A) is whether, if a particular drug were put on the market, it *would* infringe the relevant patent." *Warner-Lambert*, 316 F.3d at 1365-66 (quotation omitted, emphasis

added); *see also Forest*, 501 F.3d at 1272 (finding indirect infringement based on acts that "*will* constitute direct infringement" in the future (emphasis added)). Thus, section 271(e)(2) confers jurisdiction in situations such as this one in which an ANDA has been filed.

It is undisputed that Defendants' ANDAs use JM's infringing API. (A20; APPBr.1-2; JMBr.4-5.) The ANDA filing and the district court's finding that the ANDAs infringe the compound patent satisfy the "predicate section 271(a) direct infringement" for induced infringement. (A20; JMBr.37-38.) JM "provid[ed] its information" and "material" for the ANDA-filers to use "to obtain FDA approval" of the ANDAs, which makes the ANDAs "undoubtedly a cooperative venture." *Forest*, 501 F.3d at 1272. Accordingly, under section "271(b) [JM] has therefore actively induced the acts of [the ANDA-filers] that *will* constitute direct infringement upon approval of the ANDAs." *Forest*, 501 F.3d at 1272 (emphasis added).

Rather than addressing its future infringement, JM wrongly argues that "under section 271(e)(1) and [] section 271(a) liability requires commercial activity that does not exist before an ANDA is approved." (JMBr.37.) In other words, JM argues that its infringement has not occurred to date, while ignoring its future infringement. But section 271(e)(2) expressly creates liability for such future infringement.

Tellingly, when it suits JM to do so, JM will voluntarily recognize its future infringement liability from an ANDA that relies on JM's DMF and API. For example, JM recently filed an action seeking a noninfringement judgment for its API, alleging that a justiciable controversy existed because of a document subpoena served on JM for use in a Hatch-Waxman action (that does not include JM as a party), which JM alleged "is tantamount to accusing JM of infringement." Complaint ¶¶ 21-29, *Johnson Matthey Inc. v. Pfizer, Inc.*, No. 2:15-cv-14 (E.D. Va. Jan. 13, 2015), ECF No. 1. JM cannot have it both ways.

With JM's express written permission, Defendants' ANDAs incorporate JM's DMF by reference, and seek FDA approval to commercially market products containing JM's infringing API. (A20-21; *e.g.*, A58361.) There is no question that there is direct infringement liability by the ANDA-filers. (A19-20; APPBr.1-2.) Accordingly, "JM is liable for inducing the ANDA-Defendants' direct infringement of the compound claims." (A21-22.)

### 1. There Is Nothing "Speculative" about JM's Infringement

JM wrongly argues that filing an ANDA is a "speculative" infringement claim that does not support holding it liable for infringement. (JMBr.27.) JM's argument relies on a mischaracterization of a comment in *Warner-Lambert* concerning a claimed method of use that was not FDA-approved. 316 F.3d at 1362-63, 1365. This made the infringement allegation in *Warner-Lambert*

speculative because it depended on future inducement of off-label marketing "in contravention of FDA regulations." *Id.* at 1365.

There is no speculation here. Compound claims (just as in *Forest*) are at issue, and it is undisputed that Defendants' ANDAs use JM's infringing API. (A20-21.) "The only difference in actions brought under § 271(e)(2) is that the allegedly infringing drug has not been marketed and therefore the question of infringement ***must focus*** on what the ANDA applicant will likely market if its application is approved, an act that has not yet occurred." *Glaxo*, 110 F.3d at 1569 (emphasis added). "[T]he plan to manufacture, [] market and sell the [] products described in the ANDA[s] was undoubtedly a cooperative venture," and JM "has therefore actively induced the acts of [the ANDA-filers] that will constitute direct infringement upon approval of the ANDA[s]." *Forest*, 501 F.3d at 1272. Thus, it was not "speculative" for the district court to consider Defendants' ANDAs to find infringement by JM. (JMBr.27.)

JM's argument that *Limelight* forecloses liability for induced infringement similarly lacks merit. (JMBr.3, 34, 37-38 (citing *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111 (2014)).) Contrary to JM's arguments, *Limelight* did not concern "hypothetical future conduct." (JMBr.38 n.9.) Instead, *Limelight* concerned a method in which direct infringement did not occur "because the performance of all the patent's steps is not attributable to any one person." 134

S. Ct. at 2117, 2119.  Thus, *Limelight* is inapplicable to the situation here because there is no dispute that each of the Defendants directly infringe the compound claims by making, using, or selling JM's API.  (A19-20; A54845 ¶ 39.)

JM also relies on *ACCO* for the proposition that "[h]ypothetical instances of direct infringement" are not actionable.  (A34 (quoting *ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307 (Fed. Cir. 2007)).)  But in *ACCO* the "accused device c[ould] be used at any given time in a noninfringing manner," and there was no evidence that direct infringement would ever happen.  501 F.3d at 1313.  Unlike *ACCO*'s facts, here infringement is not speculative or hypothetical because there are no non-infringing uses of JM's API.

Infringement is properly found "under § 271(e)(2) [even if] the allegedly infringing drug has not been marketed" because "the question of infringement must focus on what the ANDA applicant will likely market if the application is approved."  *Glaxo*, 110 F.3d at 1569.  "Since the compound for which approval is sought is that which is expected to be marketed, the purpose of the submission of the ANDA is to sell that well-defined compound and the ultimate question of infringement is usually straightforward."  *Id.*

## 2. The Safe Harbor Does Not "Exempt" JM from Induced Infringement Liability

JM wrongly alleges that "an API supplier's pre-approval conduct [is] exempt under the safe harbor" and that "Shire's claim against [JM] was improper

as a matter of law."[15]  (JMBr.39, 41.)  The *Forest* panel considered the same

arguments, however, and rejected them.  The *Forest* panel's majority explained

that:

> The dissent asserts that § 271(e)(1) exempts [an API
> supplier] from being enjoined with [an ANDA-filer].  We
> disagree. . . .  [J]ust as [the ANDA-filer] will be liable
> for, and hence is being enjoined from, the commercial
> exploitation of [the API] when it is approved by the FDA
> and during the life of the patent, so should [the API
> supplier] be enjoined. . . .  It is true that, as the dissent
> states, § 271(e)(2) defines [the ANDA-filer's] filing of its
> ANDA as an infringement, and [the API supplier] did not
> file the ANDA; however, when the question of an
> injunction against commercial activity arises, [the API
> supplier] is just as culpable, and hence entitled to be
> enjoined, as [the ANDA-filer].

501 F.3d at 1272.

### 3.    Injunctive Relief Is Available to Prevent JM's Future Commercial Infringement

Section 271(e) expressly makes injunctive relief available as a remedy for

infringement.  The statute states that "injunctive relief may be granted against an

infringer ***to prevent*** the ***commercial*** manufacture, use, offer to sell, or sale . . . of

an approved drug."  35 U.S.C. § 271(e)(4) (emphasis added).  Accordingly, "just as

[the ANDA-filers] will be liable for . . . the commercial exploitation of

---

[15] JM also mischaracterizes the district court's denial of JM's motion to dismiss, alleging that the opinion stated that "the safe harbor did not apply to" JM. (JMBr.40 n.10 (citing A109340).)  In reality, the opinion found that the "conduct alleged" was not "protected under the safe harbor provision."  (A109340.)

[lisdexamfetamine dimesylate] when it is approved by the FDA and during the life of the patent, so should [the API supplier] be enjoined." *Forest*, 501 F.3d at 1272.

## C. JM's Commercial Activities Are Not Protected by the Safe Harbor

JM is wrong to allege that "the safe harbor protects everything that Johnson Matthey has done to this point," because as explained *supra*, the safe harbor does not protect JM from section 271(e)(2) infringement. (JMBr.21-22.) Nor does the safe harbor protect JM's commercial activities because they go beyond merely seeking FDA approval.

### 1. JM's API Is Outside of the Safe Harbor's Scope

JM's API is not protected by the safe harbor because it "is not itself subject to the FDA premarket approval process."[16] *Proveris Sci. Corp. v. Innovasystems, Inc.*, 536 F.3d 1256, 1265 (Fed. Cir. 2008). JM did not submit its DMF to FDA as part of a federal law or regulatory process for its API. FDA "neither independently reviews [DMFs] nor approves or disapproves submissions to a [DMF]." 21 C.F.R. § 314.420(a). (A58342.) "In short, [JM] is not a party seeking FDA approval for a product in order to enter the market to compete with patentees." *Proveris*, 536 F.3d at 1265. JM's DMF is a "routine submission[] to the FDA," and JM is not "required to maintain FDA approval" for its API. *Momenta Pharm., Inc. v.*

---

[16] Other FDCA policy considerations are not relevant because statutory symmetry is not required. *Proveris*, 536 F.3d at 1265; *Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1029 (Fed. Cir. 1997).

*Amphastar Pharm., Inc.*, 686 F.3d 1348, 1358 (Fed. Cir. 2012); 21 C.F.R.

§ 314.420(a).  Accordingly, this Court should "hold that the section 271(e)(1) safe

harbor does ***not*** immunize [JM's API] from infringement."  *Proveris*, 536 F.3d at

1265 (emphasis added).

## 2.    JM's Use of Its DMF Is Commercial

JM did not merely provide samples and information to the ANDA-filers.

(JMBr.21-22, 28-29.)  Instead, JM chose to submit a DMF to FDA "to provide

confidential detailed information" about its API to support ANDAs filed by

"[JM's] customers."  (JMBr.13, 14, 28; A58342.)

Furthermore, JM's DMF is used for commercial purposes that extend

beyond the safe harbor.  (JMBr.18, 21-22, 28.)  JM controls an ANDA-filer's

ability to refer to its DMF because the ANDA-filer may only incorporate the

DMF's information by reference "if the holder authorizes the incorporation in

writing." 21 C.F.R. § 314.420(b).  (*E.g.*, A58361.)  Once JM's DMF is

incorporated into an ANDA, JM ensures that its API will be used "[s]ince the

compound for which approval is sought is that which is expected to be marketed,

[and thus] the purpose of the submission of the ANDA is to sell that well-defined

compound."  *Glaxo*, 110 F.3d at 1569.  JM's commercial use of its DMF should be

found to extend beyond the safe harbor.

*CONFIDENTIAL MATERIAL REDACTED*

### 3.     Commercial Supply Agreements Are Not Protected by the Safe Harbor

████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████ [17]  "[T]here is an important limitation [to the safe harbor]: the use ***must be*** for 'uses reasonably related to the development and submission of information.'" *Momenta*, 686 F.3d at 1356 (quoting 35 U.S.C. § 271(e)(1)) (emphasis added). ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

---

[17] As to JM's arguments about section 271(a), Shire maintains its belief that JM is liable under section 271(a), in addition to section 271(b).  (JMBr.33; A21-22.) Shire has not conceded or waived this issue, as summary judgment denials are not appealable.  *Classen Immunotherapies, Inc. v. Biogen Idec*, 659 F.3d 1057, 1069 (Fed. Cir. 2011); *Rivas v. City of Passaic*, 365 F.3d 181, 191 (3d Cir. 2004).

### 4.    The Hatch-Waxman Act Does Not Preclude Liability for API Suppliers' Commercial Activities

JM and GPhA argue that API suppliers should be free from liability for patent infringement in Hatch-Waxman actions.  (JMBr.28; GPhABr.23, 28.)  Both ignore that section 271(e)'s language demonstrates that Hatch-Waxman actions are not limited to only ANDA-filers.  As a statutory interpretation issue, the inquiry should begin "where all such inquiries must begin: with the language of the statute itself."  *Caraco*, 132 S. Ct. at 1680 (quotation omitted).

The statute provides two separate and different remedial schemes for "an act of infringement described in paragraph 2," i.e., the submission of an ANDA. 35 U.S.C. §§ 271(e)(2)(A), (e)(4).  Subparagraph 271(e)(4)(A) expressly relates back to a filed ANDA because it states that "the court shall order the effective date of any approval of ***the*** drug . . . involved in ***the*** infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed." 35 U.S.C. § 271(e)(4)(A) (emphasis added).  "It is a rule of law well established that the definite article 'the' particularizes the subject which it precedes.  It is a word of limitation as opposed to the indefinite or generalizing force of 'a' or 'an.'" *Warner-Lambert*, 316 F.3d at 1356 (quotation omitted).  Thus, Congress's use of the antecedent "***the***" in section 271(e)(4)(A) refers back to "the drug" described in the ANDA of paragraph 2, i.e., section 271(e)(2)(A).

In contrast, a later subparagraph uses the "generalizing force of [the word] '*an*.'" *Warner-Lambert*, 316 F.3d at 1356 (emphasis added). Section 271(e)(4)(B) states that "injunctive relief may be granted against *an* infringer to prevent the commercial manufacture, use, offer to sell, or sale . . . of *an* approved drug." 35 U.S.C. § 271(e)(4)(B) (emphasis added); *see also* 35 U.S.C. § 271(e)(4)(C) (specifying the same for damages). The broader wording used in this subparagraph demonstrates that liability is not limited to only those infringers involved with "the drug" of the section 271(e)(2)(A) ANDA. Thus, JM's assertion that "section 271(e)(4) on its face precludes" injunctions against anyone other than an ANDA-filer is facially wrong. (JMBr.36 n.8.) "Congress could have been expected to use quite different language if it had wanted to reach the opposite result." *Warner-Lambert*, 316 F.3d at 1356.

Moreover, there is no conflict between the statute's remedies and the safe harbor provision. (GPhABr.27-28.) The injunctive remedy is expressly "*to prevent* the *commercial* manufacture, use, offer to sell, or sale" of the drug. 35 U.S.C. § 271(e)(4)(B) (emphasis added). Such *commercial* activities are *not* "solely for uses reasonably related to the development and submission of information." 35 U.S.C. § 271(e)(1). Thus, "just as [the ANDA-filer] will be liable for, and hence is being enjoined from, the *commercial* exploitation of [the

claimed drug] . . . so should [the API supplier] be enjoined." *Forest*, 501 F.3d at

1272 (emphasis added).

### D. *Forest* Did Not Deter API Manufacturers or ANDA Development

JM argues that the district court's decision is "needlessly dangerous" and

"suddenly expose[s]" API suppliers to liability that might "unsettle expectations."

(JMBr.30-31.)  GPhA speculates about a parade of horribles that might come to

pass.  (GPhABr.23-25.)  But JM was not deterred by *Forest*, and JM admits that

the API market is "large and expanding."  (JMBr.30.)  Thus, arguments that

holding JM liable for its infringement "would risk deterring API suppliers" ring

hollow.  (JMBr.31.)

### E. GPhA's "Alternative" Requested Relief Wrongly Seeks Judicially-Created Amnesty for API-Suppliers

GPhA argues that the Court should "make clear that a brand cannot achieve

greater relief by including an API supplier as a defendant . . . to give Shire a

nominal but entirely hollow victory."  (GPhABr.27.)  Specifically, GPhA urges

that "any injunctions against API suppliers can do no more than prohibit the API

supplier from providing API to the specific generic company in the lawsuit for

commercialization of the specific ANDA at issue in the case," and that "a

judgment against an API supplier in a suit relating to one ANDA is not binding on

the API supplier in a suit relating to any other ANDA."  (GPhABr.29.)

GPhA's requested amnesty would create an API-supplier exception to liability.  JM infringes Shire's compound patents.  JM should not be able to commercially sell its infringing API, including to support an at-risk launch of *any* drug product that uses its infringing API.  There is no principled reason to permit JM's commercial exploitation of an infringing compound *after* judgment is entered against it—regardless of whether its prospective customer has also been adjudged an infringer.  GPhA's requested amnesty substantially undermines the value and importance of the compound claims, and would lead to judicial inefficiencies, including duplicative adjudication of the merits of patent infringement, needless and wasteful adjudication of preliminary injunction motions, and unnecessary damages trials.

There is no reason that a judgment against JM should not be binding on it in other lawsuits.  Under collateral estoppel principles, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case."  *Metro. Edison Co. v. Pa. PUC*, 767 F.3d 335, 350 (3d Cir. 2014) (quotation omitted); *Ashe v. Swenson*, 397 U.S. 436 (1970).

Accordingly, Shire should be entitled to prevent JM from *commercially* offering to sell or sell its infringing API to *anyone*—not just the ANDA-filers in the current lawsuit.  JM is just as "entitled to be enjoined" as the ANDA-filers.

*Forest*, 501 F.3d at 1272.  The remedies available against JM should not be the "nominal but entirely hollow victory" that GPhA urges.  (GPhABr.27.)

## CONCLUSION

The district court's judgment that claims 1-4 of the '630 patent, claim 3 of the '787 patent, claims 1-12 of the '253 patent, and claim 4 of the '486 patent are not invalid should be affirmed. Defendants did not appeal the anticipation issues, and Defendants did not establish a *prima facie* case of obviousness for the method claim and the compound claims at issue.

The district court's denial of Defendants' motion to amend their contentions against the '253 patent should also be affirmed because Defendants' requested amendment did not comport with the Local Patent Rules.

Finally, the District Court's infringement judgment should be affirmed. The ANDA-Defendants did not appeal infringement, and principles of *stare decisis* compel affirming the district court's judgment that JM is liable for induced infringement of claims 1-4 of the '630 patent, claim 3 of the '787 patent, and claims 1-12 of the '253 patent.

Dated: January 30, 2015                    Respectfully submitted,

                                           /s/ Edgar H. Haug
                                           Edgar H. Haug
                                           Porter F. Fleming
                                           Sandra Kuzmich
                                           Angus Chen
                                           Richard F. Kurz
                                           **FROMMER LAWRENCE & HAUG LLP**
                                           745 Fifth Avenue
                                           New York, NY 10151
                                           ehaug@flhlaw.com
                                           pfleming@flhlaw.com
                                           skuzmich@flhlaw.com
                                           achen@flhlaw.com
                                           rkurz@flhlaw.com

                                           *Attorneys for Plaintiffs-Appellees*
                                           *Shire LLC and Shire Development LLC*
                                           *(f/k/a Shire Development Inc.)*

United States Court of Appeals
for the Federal Circuit

**CERTIFICATE OF SERVICE FOR CORRECTED BRIEF**

I hereby certify that I filed the foregoing Corrected Brief for Plaintiffs-
Appellees (*see* ECF No. 86) with the Clerk of the United States Court of Appeals
for the Federal Circuit via the CM/ECF system, which will send notice of such
filing to all registered CM/ECF users.  Additionally, paper copies will be mailed at
the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will
be filed with the Court, via Federal Express, within the time provided in the
Court's rules.


February 2, 2015                    By:    /s/ Richard F. Kurz
                                           Richard F. Kurz
                                           **FROMMER LAWRENCE & HAUG LLP**
                                           745 Fifth Avenue
                                           New York, NY 10151
                                           (212) 588-0800
                                           rkurz@flhlaw.com

## CERTIFICATE OF COMPLIANCE

*Undersigned counsel certifies that:*

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and this Court's Order that the brief not exceed 16,000 words.  (ECF No. 83.)  The brief contains approximately 15,723 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using **Microsoft® Word® 2007** in **14 point** type size with **Times New Roman** font.

Date:  January 30, 2015

/s/ Edgar H. Haug
Edgar H. Haug
**FROMMER LAWRENCE & HAUG LLP**
*Counsel for Appellees*
*Shire LLC and*
*Shire Development LLC*
*(f/k/a Shire Development Inc.)*